# No. 24-341

## United States Court of Appeals

*for the*

## Second Circuit

ROSALIND BELLIN, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant,*

– v. –

HOWARD A. ZUCKER, M.D., J.D., in his official capacity as Commissioner, New York State Department of Health, and ELDERSERVE HEALTH, INC., d.b.a RIVERSPRING AT HOME,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(Civil Action No. 1:19 CV 5694 (AKH))

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT ROSALIND BELLIN**

| | |
|---|---|
| AYTAN Y. BELLIN<br>KATSKY KORINS LLP<br>605 Third Avenue, 17th Floor<br>New York, New York 10158<br>(212) 716-3229 | NINA KEILIN<br>225 Broadway, Suite 1803<br>New York, New York 10007<br>(212) 302-7760 |

*Attorneys for Plaintiff-Appellant Rosalind Bellin*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................iv

PRELIMINARY STATEMENT.....................................................1

JURISDICITONAL STATEMENT ..............................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................3

STANDARDS OF REVIEW .......................................................3

SUMMARY OF ARGUMENT....................................................4

STATEMENT OF THE CASE......................................................6

    A.    State-Mandated Criteria for Awarding Medicaid Funded 24-Hour Live-In or Continuous Personal Care Services.....................6

    B.    Fair Hearing Decisions Concerning the Award of 24-Hour Personal Care Services.....................................................15

    C.    The Assessment Instrument and Process Used by MLTCs to Determine Whether a Medicaid Recipient Satisfies Either of the Six-Part Tests Above.....................................................22

        1.    The Community Health Assessment.............................22

        2.    The Process of Conducting an Assessment for Personal Care Services.....................................................23

            a.    Before May 16, 2022.....................................24

            b.    May 16, 2022 Onward.....................................25

    D.    Ms. Bellin's Initial Request for Personal Care Services and RiverSpring's Determination.....................................................27

i

E.      Ms. Bellin's Complaint and First Appeal to this Court……………...28

F.      Ms. Bellin's Class Certification Motion and Judge Hellerstein's Decision on that Motion……………………………………………...29

G.      The Parties Cross-Motions for Summary Judgment and Judge Hellerstein's Decision……………………………………………………34

ARGUMENT……………………………………………………………………...36

I.      MS. BELLIN HAS A PROPERTY INTEREST IN TWENTY-FOUR-HOUR PERSONAL CARE SERVICES BECAUSE THE STATUTES REGULATIONS, POLICY DIRECTIVES, AND FAIR HEARING DECISIONS GOVERNING THE AWARD OF SUCH SERVICES MEANINGFULLY CHANNEL OFFICIAL DISCRETION AND MANDATE A DEFINED ADMINISTRATIVE OUTCOME……………..36

A.      This Court's Recent Decision in *Barrows v. Becerra*, which Found a Property Interest in Medicare Part A Benefits, and therefore, a Right to Appeal from a Denial of those Benefits, Controls Here………………………………………………………...36

B.      The State Defendant's Medicaid Fair Hearing Decisions Show a Consistent Pattern of Mandating the Award of 24-Hour Personal Care Services for Medicaid Recipients Who Satisfy One of the Two-Six-Part Tests, Thereby Demonstrating a Property Interest in Such Services…………………………………………………..45

II.     THE REVISED MAIN CLASS AND SUBCLASSES PROPOSED BY MS. BELLIN WERE PLAINLY ASCERTAINABLE. ACCORDINGLY, JUDGE HELLERSTEIN ERRED WHEN HE REFUSED TO CERTIFY THE PROPOSED REVISED MAIN CLASS AND THE SUBCLASSES FOR LACK OF ASCERTAINABILITY…………………………………………………51

A.      Ms. Bellin's Proposed Revised Classes Are Ascertainable and Also Satisfy the Commonality and Typicality Requirements of Rule 23……………………………………………………………52

B.    Judge Hellerstein Abused His Discretion When He Ignored the Revised Class Definitions Proposed to Him by Ms. Bellin, Created his Own Faulty Class, and then Proceeded to Deny Class Certification to that Very Class for Lack of Ascertainability……………………………………..…………………57

CONCLUSION ......................................................................................61

STATEMENT OF RELATED CASES ...................................................63

CERTIFICATE OF COMPLIANCE .....................................................64

CERTIFICATE OF SERVICE ...............................................................65

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) 3, 4, 5, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 54, 55, 57

*Bellin v. Zucker*,
2022 WL 4592581 (S.D.N.Y. 2022)........................................................32, 33, 34

*Bellin v. Zucker*,
2024 WL 381022 (S.D.N.Y. 2024)...................................................34, 35, 43, 44

*Bellin v. Zucker*,
457 F. Supp.3d 414 (S.D.N.Y. 2020) .................................................................29

*Bellin v. Zucker*,
6 F.4th at 481 (2d Cir. 2021) .......................................11, 22, 29, 46, 50

*Board of Pardons v. Allen*,
482 U.S. 369 (1987)........................................................................4, 39, 40, 44

*Boucher v. Syracuse Univ.*,
164 F.3d 113 (1999)..........................................................................................58

*Brody v. Village of Port Chester*,
345 F.3d 103 (2d Cir. 2003) .............................................................................59

*Elisa W. v. City of New York*,
82 F.4th 115 (2d Cir. 2023) ...................................................................3, 55, 57

*English v. District of Columbia*,
717 F.3d 174 (D.C. Cir. 2013)..........................................................................37

*Fuentes v. Shevin*,
407 U.S. 67 (1972).............................................................................................59

*Furlong v. Shalala*,
156 F.3d 384 (2d Cir. 1998) .........................................................................5, 45

*Greenholtz v. Nebraska Penal Inmates*,
442 U.S.1 (1979)........................................................................40, 44

*Gurariy v. Zucker*,
196 A.D.3d 574 (2d Dept. 2021) ...............................................8, 41, 42

*Kapps v. Wing*,
404 F.3d 105 (2d Cir. 2005) ..................................................................59

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
897 F.3d 88 (2d Cir. 2018) .............................................................52, 53

*Leggio v. Devine*,
34 N.Y.3d 448 (2020) ................................................................46, 47, 49

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir.), *cert denied*, 520 U.S. 1211 (1997) ..............55

*Mazzei v. Money Store*,
829 F.3d 260 (2d Cir. 2016) ..................................................................58

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) ...........................................................52, 53

*Roberts v. Genting Corp. LLC*,
68 F.4th 81 (2d Cir. 2023) ......................................................................3

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) .......................................................55, 57, 58

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..........................................................................54, 56

*Woe v. Cuomo*,
729 F.2d 96 (2d Cir. 1984) ....................................................................57

*Wolff v. McDonnell*,
418 U.S. 539 (1974)................................................................................40

**Statutes**

28 U.S.C. § 1291 ......................................................................................2

28 U.S.C. § 1331 ......................................................................................1

v

42 U.S.C. § 1983 ..................................................................................1

Soc. Serv. L. § 365(1) ..........................................................................6

Soc. Serv. L. § 365-a(2) ......................................................................6

Soc. Serv. L. §§ 365-(a)(2)(e) .............................................................6

**Other Authorities**

18 N.Y.C.R.R. 505.14(b)(2)(i), (3)(i) .................................................26

18 N.Y.C.R.R (b)(1) ...........................................................................26

18 N.Y.C.R.R. § 505.14.................................... 6, 7, 8, 11, 13, 14, 24

18 N.Y.C.R.R. § 505.14(a)(1) ..............................................................6

18 N.Y.C.R.R. § 505.14(a)(2) (2021) ..........................................7, 8, 41

18 N.Y.C.R.R. § 505.14(a)(2)(2016) ...................................................7

18 N.Y.C.R.R. § 505.14(a)(3)(i) (2021) .............................................13

18 N.Y.C.R.R. § 505.14(a)(3)(ii) (2021) ............................................13

18 N.Y.C.R.R. §§ 505.14(a)(3)(iii) (2021) .........................................12

18 N.Y.C.R.R. §§ 505.14(a)(3)(iii)(*a*) ...............................................12

18 N.Y.C.R.R. § 505.14(a)(3)(iii)(*b*) (2016) ..................................8, 12

18 N.Y.C.R.R. § 505.14(a)(3)(iv) (2021) ...........................................13

18 N.Y.C.R.R. § 505.14(a)(4) (2021) ...................................................7

18 N.Y.C.R.R. § 505.14 (a)(5)(i)(*a*)(*1-9*) (2021) ...............................10

18 N.Y.C.R.R. § 505.14 (a)(5)(ii)(*a*)(*1-9*)(2016) ...............................10

18 N.Y.C.R.R. § 505.14 (a)(5)(ii)(*a*)(*1-13*) (2021) ............................10

18 N.Y.C.R.R. § 505.14(b) .................................................................42

18 N.Y.C.R.R. § 505.14 (b)(2)(i) ........................................................24

18 N.Y.C.R.R. §§ 505.14(b)(2)(iii)(*a*)(*4-13*) (2021) ...............................11

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*b*) (2021) ......................................8

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*b*)(1)(2021) ...............................11

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*b*)(2), (2)(2021) ......................11

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*c*) (2021) ..................................12

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(d)(*1-5*) (2021) .....................9, 42

18 N.Y.C.R.R. § 505.14(b)(2)(v) .............................................26, 27

18 N.Y.C.R.R. §§ 505.14(b)(3)(iv)(*a*)(*2-8*) (2016) ....................11

18 N.Y.C.R.R. § 505.14(b)(3)(iv)(*b*) (2016) .................................11

18 N.Y.C.R.R. § 505.14(b)(4)(i)(*c*)(*1*) (2016) ......................12, 13

18 N.Y.C.R.R. § 505.14(b)(4)(i)(*c*)(*2*)(*i-v*) (2016) ...............9, 42

Fed. R. App. P. 4(a)(1)(A) ............................................................2

Fed. R. Civ. P. 23 ....................................... 6, 52, 53, 57, 59, 60, 61

Fed. R. Civ. P. 23(a) ....................................................................57

Fed. R. Civ. P. 23(a)(2) ..........................................................54, 55

Fed. R. Civ. P. 23(a)(3) .................................................................55

Fed. R. Civ. P. 23(b)(2) .................................................................29

Newberg on Class Actions § 3.20 & nn.6, 7 (6th Ed.) ...................54

United States Constitution, 5th Amendment ..............................37

United States Constitution 14th Amendment ...................2, 29, 32, 37, 56

## PRELIMINARY STATEMENT

Plaintiff-Appellant Rosalind Bellin ("Ms. Bellin") respectfully submits this brief in support of her appeal of the district court's (Hellerstein, J.) (1) grant of summary judgment to Defendants-Appellees Howard M. Zucker, M.D., J.D. ("State Defendant") and Elderserve Health, Inc., d.b.a. RiverSpring at Home ("RiverSpring") (collectively "Defendants"); (2) denial of Ms. Bellin's motion for summary judgment; and (3) denial of Ms. Bellin's motion for class certification. For the reasons that follow, this Court should reverse the district court's grant of summary judgment to Defendants, grant Ms. Bellin's motion for summary judgment on the issue of the existence of a property interest in Medicaid funded, 24-hour personal care services, reverse the denial of Ms. Bellin motion for class certification due to lack of ascertainability, and remand this case for further proceedings.

## JURISDICTIONAL STATEMENT

A.     The district court had federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Ms. Bellin asserted class action claims against Defendants for violating 42 U.S.C. § 1983 in that they violated,

among other things, the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

B.     This Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because Ms. Bellin is appealing from the district court's final judgment, dated February 1, 2024, granting Defendants' motion for summary judgment and denying Ms. Bellin's motion for summary judgment.

C.     Ms. Bellin filed her Notice of Appeal on February 5, 2024, within the 30-day deadline for doing so imposed by Fed. R. App. P. 4(a)(1)(A).

D.     This appeal is from, among other things, the district court's February 1, 2024, final judgment disposing of all of Ms. Bellin's claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Did the district court err when it granted summary judgment to Defendants denying that Ms. Bellin has a property interest in Medicaid-funded 24-hour a day personal care services and in refusing to grant Ms. Bellin summary judgment that she does have a property interest in such services?

2.     Did the district court err when it ignored the revised class definitions proposed by Ms. Bellin, created its own class definition, and then denied Ms. Bellin's motion for class certification because the district court concluded that the very class that it defined lacked ascertainability?

2

### STANDARDS OF REVIEW

Where the parties below cross-move for summary judgment, this Court reviews the district court's grant and denial of summary judgment *de novo*. *See Roberts v. Genting Corp. LLC*, 68 F.4th 81, 88 (2d Cir. 2023). This "[C]ourt evaluates each party's motion on its own merits," and "all reasonable inferences are drawn against the party whose motion is under consideration." *Id.* (internal quotation marks omitted).

This Court reviews class certification rulings under an abuse of discretion standard. *E.g., Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023); *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022). "A court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Elisa W.*, 82 F.4th at 122. "Although [this Court's] review of the legal standards applied by the district court is *de novo*, [this Court] review[s] the district court's application of those standards to the facts of the case for abuse of discretion." *Id.* (internal quotation marks omitted). "[This Court's] review of district court decisions denying class certification is noticeably less deferential than when a class has been certified." *Id.* (internal quotation marks omitted). *Accord Becerra*, 24 F.4th at 130.

3

## SUMMARY OF ARGUMENT

**POINT I:** Ms. Bellin has a property interest in 24-hour-a-day Medicaid-funded personal care services because New York statutes, regulations, and administrative directives governing the award of such services meaningfully channel official discretion and mandate the award of such services when one of two six-part tests is satisfied. Those tests set forth objective criteria, and even if they utilized some subjective criteria — which they do not — well-settled Supreme Court authority makes plain Ms. Bellin would still have a property interest in 24-hour-a-day personal care services. *E.g., Board of Pardons v. Allen*, 482 U.S. 369, 377-81 (1987),

The fact that nurse assessors must utilize professional discretion to determine whether one of the above two-part tests is satisfied does not mean their discretion is not adequately channeled for purposes of discerning a property interest. This Court's recent decision in *Becerra* makes clear that when an assessor "uses judgment in applying the standards set by the state, so long as an administrative action is *required after* the [assessor] determines (*in its broad discretion*) that the necessary prerequisites exist, a property interest exists in the benefits regime." *Becerra*, 24 F.4th at 140 (internal quotation marks omitted) (holding, under this standard, that there was a property interest in the award of

4

Medicaid Part A benefits). *Becerra* is controlling here, and therefore Ms. Bellin has a property interest in the award of 24-hour personal care services.

In addition, fair hearing decisions issued by the State Defendant that award 24-hour personal care services when the criteria for such services are satisfied further demonstrate that Ms. Bellin has a property interest in the award of such services. As this Court has held, a "constant, persistent pattern of ALJ decisions" concerning the circumstances under which a public benefit is awarded is sufficient to create a property interest in and of itself. *Furlong v. Shalala*, 156 F.3d 384, 395-96 (2d Cir. 1998).

**POINT II:** The district court abused its discretion when it ignored Ms. Bellin's revised proposed class definitions, and created its own class definition which it then rejected as not ascertainable. District courts have a duty to create workable class definitions, if possible, when doing so is not an undue burden, even if the proposed class plaintiff has not provided such definitions. A fortiori, where, as here, Ms. Bellin's actually proposed revised class definitions, the district court abused its discretion when it did not even consider them.

Moreover, Ms. Bellin's revised proposed class definitions are ascertainable because they are defined using objective criteria that establish a membership with definite boundaries. Moreover, while a portion of the district court's challenge to the ascertainability of its self-defined class was really a challenge to commonality

and typicality of that class, Ms. Bellin's revised classes satisfy the commonality and typicality requirements of Rule 23 because Ms. Bellin and the members of the proposed classes are challenging the same behavior of the Defendants. That is, (1) the failure of the Defendants to afford Medicaid recipients the right to appeal initial pre-enrollment determinations of personal care service hours by MLTCs; and (2) the failure of Defendants to provide Medicaid recipients notice of that right to appeal. Moreover, Ms. Bellin and the proposed classes share common issues of law and fact regarding these issues.

Accordingly, the district court erred when it denied Ms. Bellin's motion for class certification based the district court's finding that the very class that it defined — which was not proposed by Ms. Bellin — lacked ascertainabilty.

## **STATEMENT OF THE CASE**

**A.    State-Mandated Criteria for Awarding Medicaid Funded 24-Hour Live-In or Continuous Personal Care Services**

18 N.Y.C.R.R. § 505.14 ("the Regulation") requires that personal care services be provided when they are "medically necessary for maintaining an individual's health and safety in his own home. . . ." 18 N.Y.C.R.R. § 505.14(a)(1). Accord Soc. Serv. L. §§ 365(1) (requiring provision of "medically necessary" care); 365-a(2); 365-a(2)(e) (personal care services included in the medically necessary care that must be provided). The Regulation and state policy directives define "[l]ive-in 24 hour personal care services" as "the provision of

6

care by one personal care aide for a patient who, because of the patient's medical condition, needs assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding and whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep." 18 N.Y.C.R.R. § 505.14(a)(4) (2021);18 N.Y.C.R.R. § 505.14(a)(4) (2016); MLTC Policy Directive 15.09, JA2293, ¶3; Policy Directive GIS 12 MA/026, JA2290, ¶3

The Regulation and state policy directives define "[c]ontinuous personal care services" as "the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24-hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep." 18 N.Y.C.R.R. § 505.14(a)(2) (2021);18 N.Y.C.R.R. § 505.14(a)(2)(2016); MLTC Policy Directive 15.09, JA2293-JA2294. ¶ 3(a ); Policy Directive GIS 12 MA/026, JA2290, ¶3.[1] New York appellate

---

[1] "Live-in 24-hour personal care services" are also known as "live-in care" and "Continuous personal care services" are also known as "split-shift care."

authority makes plain that the above two definitions constitute the "criteria" for determining whether a Medicaid recipient is entitled to continuous or live-in personal care services, and that such services must be provided if those criteria are met. *Gurariy v. Zucker*, 196 A.D.3d 574, 577 (2d Dept. 2021) (awarding continuous personal care services to the appellant because the appellant satisfied the criteria contained in § 505.14(a)(2) and reversing DOH's ruling to the contrary).

The Regulation and State policy directives specify the procedure and timing for social service districts and/or MLTC plans to calculate the amount and need for personal care services.[2]  "[T]he social services district or [MLTC] *must first determine* whether the individual, because of the individual's medical condition, would be otherwise eligible for personal care services, including continuous personal care services or live-in 24-hour personal care services." 18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*b*) (2021); 18 N.Y.C.R.R. § 505.14(a)(3)(iii)(*b*) (2016); MLTC

---

[2] The Regulation was amended in 2021 to change the sequence of some assessments and the personnel conducting those assessments, although the changes are not ultimately substantive.  The change went into effect on May 16, 2022. This date is undisputed.  Because the litigation began in 2019 under the old procedure, the Parties stipulated in all depositions to acknowledge the amendment and to have the witnesses answer questions about procedures by referring to events before and after May 16, 2022.  Thus, both versions of each regulatory provision cited here are also listed, with the newer version appearing first and the earlier version second.

8

Policy Directive 15.09, JA2294, ¶ 6.  To do so, the social services district or MLTC

must, among other things, assess and document:

> (*1*) whether the practitioner order indicated a medical condition that
> causes the individual to need frequent assistance during a calendar day
> with toileting, walking, transferring, turning and positioning, or
> feeding;

> (*2*) the specific personal care functions with which the individual
> needs frequent assistance during a calendar day;

> (*3*) the frequency at which the individual needs assistance with these
> personal care functions during a calendar day;

> (*4*) whether the individual needs similar assistance with these personal
> care functions during the individual's waking and sleeping hours and,
> if not, why not;

> and

> (*5*) whether, were live-in 24-hour personal care services to be
> authorized, the personal care aide would be likely to obtain, on a
> regular basis, five hours daily of uninterrupted sleep during the aide's
> eight hour period of sleep.

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(d)(*1-5*) (2021); 18 N.Y.C.R.R. §

505.14(b)(4)(i)(*c*)(*2*)(*i-v*) (2016); MLTC Policy Directive 16.07, JA2298, ¶ 6;

Policy Directive GIS12 MA/026, JA2287-JA2288.

While, in general, MLTCs may use task-based assessment tools —typically

charts or lists of tasks that are used to tally up the hours needed by an applicant for

help with Activities of Daily Living ("ADLs") and Instrumental Activities of Daily

Living ("IADLs") — to calculate the number of personal care hours to award,

there is an important limitation to that use that is directly relevant to this case.[3] Before using such tools, all MLTC plans must evaluate and document when and to what extent the enrollee requires assistance with IADLs and ADLs and whether needed assistance can be scheduled, is recurring, or may occur at unpredictable times during the day or night JA2671:8:10; JA2674:17-21; JA2688:9- JA2689:3; MLTC Policy Directive 16.07, JA2298; Policy Directive GIS 03 MA/003, JA2284. An example of an unscheduled need that could lead to someone getting 24 hour-live in or continuous personal care services would be if the person needed assistance using the bathroom during the day and night at times that cannot be predicted (JA267:21-2674:7, JA2675:6-77:8.

When the assessment makes clear that the Medicaid recipient needs some form of twenty-four-hour care because their needs are unscheduled or frequent or both and occur during the day and night, the agencies or plans *must* discard any reference to a task-based assessment tool and authorize one of the forms of twenty-four-hour care, either live-in or continuous care, as described above. MLTC Policy

---

[3] ADLs include, but are not limited to, bathing, dressing, grooming, toileting, walking, transferring, turning and positioning, meal preparation in accordance with modified diets, and feeding. MLTC Policy Directive 16.07, JA2297; 18 N.Y.C.R.R. § 505.14 (a)(5)(ii)(*a*)(*1-13*) (2021)*;* 18 N.Y.C.R.R. § 505.14 (a)(5)(ii)(*a*)(*1-9*)(2016). IADLs include, but are not limited to light cleaning, shopping, and simple meal preparation. MLTC Policy Directive 16.07, JA2297; 18 N.Y.C.R.R. § 505.14 (a)(5)(i)(*a*)(*1-9*) (2021); 18 N.Y.C.R.R. § 505.14 (a)(5)(i)(*a*)*(1-9)* (2016).

Directive 16.07.  JA2298 "The fact that a [Medicaid recipient's] needs, such as turning and positioning and diaper changes, are predictable does not preclude the receipt of 24-hour split-shift care, if the person has a documented medical need for the tasks to be performed with a frequency that would not allow a live-in aide to perform them and still obtain an uninterrupted five hours of sleep."  MLTC Policy Directive 12 MA/026, JA2287-JA2288

The Regulation and state policy directives next require that the decision-maker review whether the individuals' necessary amount of service can be reduced by the use of alternate means, such as equipment, alternate services, or volunteer caretakers. 18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*b*)(1), (2)(2021); 18 N.Y.C.R.R. § 505.14(b)(3)(iv)(*b*) (2016); MLTC Policy Directive 16.07, JA2298; MLTC Policy Directive 15.09, JA2294, ¶ 4; Policy Directive GIS MA/024, JA2290; Policy Directive GIS 03 MA/003, JA2284.  The Regulation specifies numerous objective factors that the MLTC must take into consideration in making that determination. *Bellin*, 6 F.4th at 478 (so holding); 18 N.Y.C.R.R. §§ 505.14(b)(2)(iii)(*a*)(*4-13*) (2021); 505.14(b)(2)(iii)(*b*)(*1*), (*2*) (2021); 18 N.Y.C.R.R. §§ 505.14(b)(3)(iv)(*a*)(*2-8*) (2016); 505.14(b)(3)(iv)(*b*) (2016).  If after considering the above factors, the MLTC concludes that the Medicaid recipient can be served more cost effectively with other services and/or voluntary care givers, and those services and/or voluntary care givers are available, the MLTC must include those services as part

11

of the Medicaid recipient's plan of care. 18 N.Y.C.R.R. §§ 505.14(a)(3)(iii) (2021); 505.14(b)(2)(iii)(*b*)(*1*), (*2*) (2021); 18 N.Y.C.R.R. §§ 505.14(a)(3)(iii)(*a*), (*b*) (2016); 505.14(b)(3)(iv)(*b*) (2016). But if the Medicaid Recipient's needs cannot be met fully or reduced by use of alternate means, the MLTC must authorize the full amount of service necessary—live-in or continuous twenty-four-hour personal care services. *See, e.g.*, JA3136:21-23.

In addition, where a Medicaid recipient otherwise qualifies for live-in 24-hour personal care services, the MLTC must award continuous personal care services if the Medicaid recipient's home has no sleeping accommodations for the personal care aide. 18 N.Y.C.R.R. § 505.14(b)(2)(iii)(*c*) (2021); 18 N.Y.C.R.R. § 505.14(b)(4)(i)(*c*)(*1*) (2016); MLTC Policy Directive 15.09, JA2294, ¶ 7; Policy Directive GIS 15 MA/024, JA2290.

Furthermore, Medicaid recipients may not be awarded personal care hours for "safety monitoring" as a "stand alone" task, but must be awarded personal care hours when safety monitoring is necessary "while providing assistance [to the Medicaid recipient] with the performance of personal care tasks, such as transferring, toileting, or walking, to assure the task is being safely completed." JA2297-98. Accordingly, an MLTC may not use a Medicaid recipient's need for safety monitoring as an excuse to preclude authorizing 24-hour care when the

Medicaid recipient's need for safety monitoring is part of the need for assistance with personal care tasks. *See id*.[4]

Finally, to be eligible for personal care services, the Medicaid recipient's medical condition must be stable, 18 N.Y.C.R.R. § 505.14(a)(3)(i) (2021); 18 N.Y.C.R.R. § 505.14(a)(3)(i) (2016), and the Medicaid recipient must either be self-directing or supervision of the Medicaid recipient must be available from other sources. 18 N.Y.C.R.R. § 505.14(a)(3)(ii) (2021); 18 N.Y.C.R.R. § 505.14(a)(3)(ii) (2016).[5]

In sum, the regulations and administrative directives set forth clear step-by-step criteria for a mandatory award of live-in 24-hour personal care services and continuous personal care services. These criteria can be expressed in the form of

---

[4] Another amendment to the Regulation, 18 N.Y.C.R.R. § 505.14(a)(3)(iv) (2021) contains minimum needs requirements that Medicaid recipients must meet to obtain personal care services. These requirements are not yet in effect, owing to a Pandemic-related funding program from the federal government supporting enhanced personal care services. Accordingly, the new provision of the regulation, which serves to restrict the opportunity to obtain personal care services, cannot yet be implemented. Explanation and information at https://www.medicaid.gov/medicaid/home-community-based-services/guidance/strengthening-and-investing-home-and-community-based-services-for-medicaid-beneficiaries-american-rescue-plan-act-of-2021-section-9817/index.html.

[5] The State Defendant's Guideline for the Provision of Personal Care Services reiterate the personal care standards described above. JA2527-JA2530.

two tests that Ms. Bellin has derived from the Regulation and directives.[6] An

MLTC must award live-in 24-hour personal care services to a Medicaid recipient

when:

 (1) the Medicaid recipient, because of the recipient's medical

condition, needs assistance during a calendar day with toileting,

walking, transferring, turning and positioning, or feeding, and those

needs are unscheduled or frequent or both and occur during the day

and night;

(2) the Medicaid recipient's need for that assistance is sufficiently

infrequent that a live-in 24-hour personal care aide would be likely to

obtain, on a regular basis, five hours daily of uninterrupted sleep

during the aide's eight-hour period of sleep;

(3)  the Medicaid recipient's home has sleeping accommodations for

the personal care aide;

(4) the Medicaid recipient's condition is stable;

(5) the Medicaid recipient is either self-directing or supervision of the

Medicaid recipient is available from other sources.

---

[6] Although Defendants below claimed that the State Defendant has not explicitly denominated these factors a "test," as such, for 24-hour personal care services, the approval process boils down to these six factors extracted from the Regulation and the State policy directives.

(6) there are no more cost-effective ways to provide the Medicaid

recipient with necessary care, including equipment or other

individuals who would provide services voluntarily.

An MLTC must award continuous personal care services to a Medicaid

recipient when the Medicaid recipient satisfies steps 1 and 4-6 above, and either

(a) the Medicaid recipient's need for such assistance is so frequent that a live-in

24-hour personal care aide would be unlikely to obtain, on a regular basis, five

hours daily of uninterrupted sleep during the aide's eight-hour period of sleep or (b)

the Medicaid recipient would otherwise be qualified only for live-in 24-hour

personal care services, but the Medicaid recipient's home has no sleeping

accommodations for the personal care aide.

## B.    Fair Hearing Decisions Concerning the Award of 24-Hour Personal Care Services

In the district court, Ms. Bellin presented a group of 108 Fair Hearing

decisions, rendered by the State Defendant, that demonstrate conclusively that the

provision of 24-hour personal care service, whether live-in or split shift, is

mandatory when the applicant satisfies specific criteria ("Fair Hearing

Compilation").  *See* JA3937-JA4029.[7]  The decisions reflect cases in which

---

[7] Each decision includes a short summary of how each case was decided, and quotes and highlights relevant sections that demonstrate the rationale of the decisions.

MLTCs denied Medicaid recipients' requests for an increase in personal care services to a form of 24-hour care, and the State Defendant reversed those denials. The State Defendant based those reversals on the application of the rules set forth in the two six-part tests, described above, to the evidence at the hearings.

The first factor in both tests focuses on whether the Medicaid recipient actually needs help with toileting, transferring, feeding and or turning and positioning at all times of the day and night. The fair hearing decisions typically turn on the issues of toileting, transferring, ambulating, and turning and positioning. This is not surprising. Toileting is often related to incontinence and the need for diaper changes, and toileting issues are often unpredictable (or recurring) in the day and night; alternatively, toileting is related to a need for help with ambulation or transfer to a toilet or commode, and then help with getting dressed and cleaned up after toileting—again, an unscheduled (or recurring) need in the day or night. The issue of turning and positioning is related to whether the individual has lost the ability to turn and move independently while lying in bed, as turning and positioning is needed to prevent bed sores. If a person requires this service, it will typically be at specified intervals and therefore recurring in the day and night.[8]

---

[8] As a practical matter, the issue of nighttime feeding rarely arises in fair hearing decisions; we have found one decision in this group, for someone who also had needs for nighttime toileting.

16

The second factor reviews the frequency of need—whether the individual could be served by a live-in aide or whether the necessary services are more frequently needed such that an aide would not be able to get five hours of uninterrupted sleep in the night.

The third factor is related, in that it assesses whether or not there is room in the applicant's home for an aide to sleep or whether there is no space. An exception to the live-in care rules requires that split-shift care be authorized when there is no place for an aide to sleep.

Factors four and five — stable medical condition and ability to self-direct or having someone else to direct applicant's care — are threshold requirements that all personal care recipients must meet.[9]

Finally, factor six assesses whether, once it has been determined that the appellant needs some form of 24-hour care, whether any substitutes for aide service can safely be used by the applicant, such as equipment and medical supplies, or whether there is available assistance by an "informal caregiver," such as a family member. If none of these substitutes is available, then one or the two forms of 24-hour care is ordered depending on whether there is space for the aide to sleep and the frequency of need identified in factors 1, 2, and 3

_____

[9] As a practical matter, issues concerning factors 4 and 5 rarely, if ever, arise in the context of this type of case, and we have found none in the searches we conducted.

17

A review of the 108 fair hearing decisions in the Compilation makes clear that they consistently fall into only a few standard fact patterns, which relate to the requirements set forth in the six-part tests. The results turn on a review by the ALJ of the MLTC's written CHA assessments, which often bely the rationales offered by the plans, and additional medical records, such as physician's letters and sleep logs of aides, and testimony from family members.

For example, there are numerous decisions where the individual asks for more hours because there is an increase in toileting needs at night. In these cases, the MLTCs often deny the request, alleging that the appellant can simply rely on "incontinence supplies" to "keep dry" without help in changing them. The MLTCs are generally reversed, because the diaper will not keep the patient dry and the patient needs help in changing. JA3940-JA3941, JA3946-JA3947, JA3962-JA3963, JA3963-JA3964, JA3965, JA3970-JA3971, JA3971-JA3972, JA3972, JA3972-JA3973, JA3973-JA3974, JA3974-JA3975, JA3975-JA3976, JA3976-JA3977, JA3978-JA3979, JA4002-JA4003, JA4008-JA4009, JA4010-JA4011, JA4011-JA4012, JA4013-JA4014, JA4015-JA4016, JA4022-JA4023.

There are a number of cases where the individual asks for more hours to prevent falls while ambulating to the toilet, for example. The plan will deny, alleging that the appellant is asking for "companionship" or "standalone safety monitoring," which is not a required service. The plans are reversed because the

evidence shows that the appellant really does need help with ambulation and toileting; the plans have been admonished against using safety monitoring this way (see Policy Directive GIS 03 MA/033),[10] which reminds plans that they cannot use a need for safety monitoring as an excuse to preclude authorizing 24-hour care when the safety monitoring is part of the assistance with personal care tasks.  .  JA3951-JA3952, JA3961-JA3962, JA3962, JA3965, JA3965-JA3967, JA3967, JA3968-JA3969, JA3974-JA3975, JA3975-JA3976, JA3977, JA3978-JA3979, JA3981-JA3982, JA3982-JA3983, JA3983-JA3984, JA3987-JA3988, JA3989-JA3991, JA3992-JA3093, JA4000-JA4001, JA4002-JA4003, JA4003, JA4008-JA4009, JA4009-JA4010, JA4011-JA4012, JA4014-JA4015, JA4015- JA4016, JA4020- JA4021, JA4022- JA4023, JA4023.

In another group of cases, the appellants request more hours but the plans deny the increases because the appellants allegedly have not shown a change in their condition. But the plans are reversed because the evidence shows that the appellant's condition has deteriorated and that he or she has lost function in walking or has increased incontinence or bed immobility. The evidence may already be shown in the plan's documents.  JA3943, JA3948- JA3949, JA3984-

---

[10] Located at https://www.health.ny.gov/health_care/medicaid/publications/docs/gis/03ma003.pdf

JA3985, JA3989- JA3991, JA3992, JA3995- JA3996, JA4005-JA4006, JA4012-JA4013, JA4013-JA4014, JA4019-JA4020.

In another group of cases, the plans deny an increase while relying on a "tasking tool," a chart that allows assessors to total up the time needed for various tasks, the use of which is not permitted in 24-hour cases. The plans are reversed because the evidence shows that the plan was aware of 24-hour needs and should not have used the prohibited tool. JA3979- JA3980, JA3983- JA3984, JA3985-JA3986, JA3991- JA3992, JA3997, JA3997- JA3998, JA3998- JA3999, JA4000, JA4003-JA4004, JA4013J, A4017, JA4018.

Another typical scenario involves a request for an increase in hours where the plan denies the request, alleging that the appellant has "support" from family. The plan is reversed because it turns out that the family is not available, for example, living far away or even being deceased. The plans are frequently admonished not to do this by reference to GIS 97 MA/033. [11] JA3948- JA3949, JA3953- JA3954, JA3956- JA3957, JA3961, JA3961- JA3962, JA3984- JA3985, JA3986- JA3987, JA3992, JA3999, JA4013-JA4014, JA4014, JA4016- JA4017, JA4018- JA4019, JA4021, JA4021- JA4022, JA4024- JA4025, JA4025- JA4026, JA-4026- JA4027, JA4027.

---

[11] Located at
https://www.health.ny.gov/health_care/medicaid/publications/docs/gis/03ma003.pdf

20

A final group consists of cases where the plan denies an increase to split-shift care, either from live-in care or a lesser amount, alleging that there is insufficient frequency of nighttime need. In this group, the plans are reversed where the evidence showed that the nighttime needs were actually frequent such that a live-in aide cannot get the prescribed amount of uninterrupted sleep. There are a very large number of cases in this category. JA3938- JA3939, JA3939- JA3940, JA3942- JA3943, JA3944, JA3944- JA3945, JA3945- JA3946, JA3947, JA3949, JA3949- JA3950, JA3950- JA3951, JA3952- JA3953, JA3954- JA3955, JA3955, JA3956, JA3957- JA3958, JA3958- JA3959, JA3959- JA3960, JA3960- JA3961, JA3962, JA3992, JA3993- JA3994, JA3994- JA3995, JA4001-JA4002, JA4004-JA4005, JA4007-JA4008, JA4014.

Of course, many decisions involve more than one of the above fact patterns, making it even clearer why the plans are reversed. In any event, the fair hearing decisions cited above make plain that a pattern exists in which the provision of 24-hour care is mandatory upon the satisfaction of the factors in one of the two tests described above. This pattern shows the policy of the Department of Health concerning how it interprets the criteria for the award of personal-care services and belies the State Defendant's representations that the process is random, discretionary, and not mandatory.

21

For this additional reason, this Court should find that the Plaintiff has clearly demonstrated a property right in 24-hour personal care services. Moreover, despite their multiplicity of opportunities in this case, Defendants failed to cite a single fair hearing decision to the district court — and Ms. Bellin has found none — that contradicts Ms. Bellin's position and denies 24-hour personal care service when one of the two six-part tests was satisfied. Accordingly, this Court should find that Ms. Bellin has demonstrated a property right in 24-hour personal care services.

### C. The Assessment Instrument and Process Used by MLTCs to Determine Whether a Medicaid Recipient Satisfies Either of the Six-Part Tests Above

#### 1. The Community Health Assessment

In order to determine whether a Medicaid recipient satisfies one of the six-part tests for the mandatory provision of 24-hour live-in or split-shift personal care described above, assessors begin by utilizing a State-mandated assessment instrument known as the Community Health Assessment ("CHA").[12] JA2628:23-29:4); JA2507-JA2524 (copy of blank form). The CHA is a lengthy questionnaire that an assessing nurse uses to obtain essential information about the potential applicant or recipient's need for services by asking detailed questions about the person's ability to perform ADLs and IADLs. *Id*. The individual's capacity to

---

[12] The CHA was referred to as the UAS ("Uniform Assessment System") in the previous appeal to this Court. *Bellin v. Zucker*, 6 F.4th at 481.

22

perform, and actual performance of ADLs and IADLs are scored in one of several categories: independent, setup help only, supervision (oversight/cueing), limited assistance, extensive assistance, maximal assistance, or total dependence. JA2635:13-JA2638:9, JA2638:15-17; JA2514-JA2515.

The CHA is a standardized tool that is supposed to be "as objective as possible" and, among other things, indicates whether the person needs personal care services or other types of services. JA2628:4-22; JA2624:25-JA2625:26:9, JA2633:9-JA2634:21, JA2639:24-JA2640:24; JA2301-JA2398; JA2400-JA2505 (CHA training manuals). While the CHA does not by itself produce a determination of home care authorization amounts, the information collected in the CHA helps determine the number of personal care hours required under "existing laws, regulations, policy, and guidance. . . ." JA2301-JA2398; JA2400-JA2505; JA2507-JA2524; JA2622:13-JA2623:2; JA2623:3 –JA2624:14; JA2628:4– 22).

## 2. The Process of Conducting an Assessment for Personal Care Services

An individual who is seeking personal care services and is not already a Medicaid recipient must first apply to the local department of social services for a Medicaid eligibility determination (Bick: 17:19-18:11). Once Medicaid eligibility is determined, the individual may move on to apply for long term care services.

As was detailed further above, in footnote 2, the regulation was amended in 2021 and took effect on May 16, 2022, so there are some variations in procedure; these do not substantively affect outcome.

### a.    Before May 16, 2022

Under the pre-May 16, 2022 procedure, the person seeking personal care services had to contact an agency called the Conflict Free Evaluation and Enrollment Center ("CFEEC") and the CFEEC would determine whether the person was eligible for long term care services in general for 120 days or more JA2617:11-JA2618:6, JA2618:9-JA2619:15).  The applicant also required an "order" from his or her treating physician on a form approved by the State. 18 N.Y.C.R.R. § 505.14 (b)(2)(i); (3)(i)(*a*) – (*e*).

Next, the MLTC chosen by the Medicaid recipient would perform a new CHA in the manner described in Section E(1) above. JA2629:2-4. After completing the CHA, the MLTCs would create an individual care plan for the Medicaid recipient. JA2651:6-10. The MLTC's care planning process reviewed many factors in the Medicaid recipient's life when developing a plan of care, including the recipient's living environment, interests, needs, abilities and available supports. JA2651:11-20.

The MLTC would determine the types of services and the amount of the services to provide the Medicaid recipient by analyzing the CHA's ADL and IADL

24

functional level assessments, as well as information from the Medicaid recipients'

family members, and other individuals familiar with the Medicaid recipient (Bick:

54:3-12, 55:17-57:16). The plan of care created by the MLTC would delineate the

type of service, including personal care, as well as the amount of the service that

the MLTC was going to provide.  JA2651:20-25, JA2652:2-JA2653:2). The State

Defendant required the MLTC to award services of the type and amount needed

based on the objective evidence described above and the State Defendant did not

permit MLTCs plan to award services of a different type or amount not reflected

by that evidence.  JA2659:14-JA2660:9, JA2682:23-JA2683-9; JA2684:22-

JA2686:5).

### b.    May 16, 2022 Onward.

From May 16, 2022, onward (after a transition period), the CFEEC agency

was replaced by an entity called the New York Independent Assessor (NYIA);

NYIA is now responsible for the initial conflict-free assessment CHA. JA2648:24-

JA2650:2). This CHA has the same purpose as the CFEEC CHA, that is,

determining whether the applicant needs CBLTSS for more than 120 days.

JA2650:4-9

If the applicant is determined in need of CBLTSS, then the applicant is

referred to MTLC plans as before. Now, however, the MLTC plans do not perform

a second CHA assessment; rather they use the CHA assessment created by the

25

NYIA when formulating a plan of care for a Medicaid recipient. JA2650:10-JA2651:20); JA2751:4-JA2752:2. The MLTC nurse assessor, who must perform an objective analysis, still meets with the Medicaid recipient, the Medicaid recipient's family, and other person(s) designated by the Medicaid recipient to go over the CHA, may collect additional medical information and medical records, and develops a plan of care. JA2651:9-20.

Another factor that has been added is an exam by a member of an independent practitioner panel, either a physician, or a nurse practitioner, or a physician's assistant. These practitioners are part of NYIA. 18 N.Y.C.R.R (b)(1); (b)(2)(ii). This replaces a function that was previously performed by the individual's treating physician. 18 N.Y.C.R.R. 505.14(b)(2)(i), (3)(i).

Another new procedure relevant to this case, effective post May 16, 2022, is the "independent medical review of high needs cases." This new regulatory procedure provides that before an MLTC may authorize more than 12 hours of personal care services, an independent medical review panel must review the case and make a recommendation to the MLTC as to whether that care should be authorized. 18 N.Y.C.R.R. § 505.14(b)(2)(v). Despite the addition of this new layer of review, however, the criteria for awarding 24-hour live-in or continuous personal care services remain the same and the recommendations of the independent review panel are not binding on the MLTC plans. JA2768:22-25.

**D.   Ms. Bellin's Initial Request for Personal Care Services and RiverSpring's Determination**

In April 2019, Ms. Bellin was 80 years old and suffered from a number of serious illnesses that severely limited her ability to perform activities of daily living.  JA0024, ¶ 2.   Ms. Bellin, a Medicaid recipient, required significant assistance from home-care attendants, 24 hours a day, throughout the day and night. *Id*.  In April 2019, Ms. Bellin, through her daughter, applied for Medicaid-funded personal care services through RiverSpring, a managed long-term care company ("MLTC") that has a contract with the State Defendant. *Id.*; JA2242, ¶ 2. RiverSpring assessed Ms. Bellin using the New York State Department of Health's Uniform Assessment System--New York ("UAS") and only authorized Ms. Bellin to receive 8 hours of personal care services a day, 7 days a week, which was less than she needed.  JA2230; JA2243.

Ms. Bellin's daughter protested that the number of hours was inadequate, but she was unable to get a change in the authorization.   Wanting to get at least some services, Ms. Bellin told RiverSpring she would enroll anyway and filled out the necessary paperwork on or about May 17, 2019.  JA0061.

On or about May 22, 2019, before her enrollment took effect, Ms. Bellin, through her attorney, attempted to appeal this inadequate determination. RiverSpring notified the attorney that there were no challenges allowed in the pre-enrollment period. JA0061. Ms.  Bellin's official enrollment took effect on June 1,

27

2019, as did her 8 hours of service. JA0061 Ms. Bellin also attempted to appeal the assessment after June 1, 2019, using the prescribed "internal appeal" process typically used for adverse determinations. JA0061. RiverSpring refused to hear or decide that appeal, contending that no appeals were permitted from initial determinations of personal care services hours by MLTCs. JA0061

Treating Ms. Bellin's request for an appeal of RiverSpring's initial determination as a new request for additional personal care hours on a going-forward basis, RiverSpring stated that it would make a new determination and inform Ms. Bellin of it. JA0089 After conducting a number of evaluations, RiverSpring authorized personal care services for Ms. Bellin 24 hours a day, 7 days a week, and provided that care from July 15, 2019, forward. JA0063 RiverSpring never heard or decided Ms. Bellin's request to appeal of RiverSpring's initial pre-enrollment determination. JA2070, ¶ 32.[13]

### E. Ms. Bellin's Complaint and First Appeal to this Court

Ms. Bellin filed the class-action complaint ("Complaint") in this matter on June 18, 2019. (JA0024-JA0041. The Complaint challenged the State's policy to refuse to permit appeals from initial personal care services hours determinations on two grounds: (1) that Medicaid statutes and regulations governing hearings and

---

[13] Subsequently, at the motion to dismiss stage of this litigation, State Defendant confirmed that he believed he was not required by law to offer a right to appeal initial PCS authorizations by MLTC plans. JA0046-JA0047, ¶¶ 14-17)

appeals required the state to offer appeals of initial determination ("statutory

claim"); and (2) that the Due Process clause of the 14th Amendment to the United

States Constitution also required such appeals ("Due Process claim"). JA0039.

On April 30, 2020, Judge Hellerstein granted Defendants' motions to dismiss.

*Bellin v. Zucker,* 457 F. Supp.3d 414, 422 (S.D.N.Y. 2020).

Ms. Bellin then appealed to this Court. *Bellin v. Zucker*, 6 F.4th 463 (2d Cir.

2021). While this Court affirmed the dismissal of Ms. Bellin's statutory claim, *id*.

at 483-85, it remanded the case to the district court for discovery on, and

consideration of, Ms. Bellin's due process claim, *Id.* at 482. This Court directed

the district court to, among other things, determine whether the State's required

process for assessing personal care hours sufficiently channeled the discretion of

the assessors such that a property right existed in those personal care hours. *Id.*

## F.    Ms. Bellin's Class Certification Motion and Judge Hellerstein's Decision on that Motion

On June 21, 2022, Ms. Bellin filed a motion for class certification

under Rule 23(b)(2), requesting certification of one main class and three

subclasses. District Court Docket No. ("Dkt. No.") 95 at 4-5. In response to

objections Defendants made to the definitions of the Main Class and

Subclass A, Ms. Bellin, in her reply memorandum of law, proposed modified

class definitions.[14]  The new classes essentially narrowed the potential

membership to eliminate those who either would not be enrolled in MLTCs

or would not be enrolled in the same service type as the named Plaintiff.

---

[14] Ms. Bellin's proposed the following revised definitions of the Main Class and the Subclasses:

> **Main Class**: All past, present and future New York State Medicaid recipients who, from June 18, 2016, onward have applied or wish to apply for Community Based Long Term Care Services and Supports (CBLTCSS) because they wish to obtain Medicaid-funded personal care service from MLTC partial capitation plans — that had, have and will have contracts with the State Defendant — and who have been found and will be found eligible for CBLTCSS by a Conflict-Free Evaluation and Enrollment Center ("CFEEC") from June 18, 2016, through May 15, 2022, or a CFEEC equivalent from May 16, 2022, onward, who have received or will receive initial pre-enrollment offers for personal care service hours from any one or more MLTC plans, and who chose or choose to enroll with an MLTC plan for such personal care services, and received or will receive such services.

> **Subclass A:** All past, present and future New York State Medicaid recipients who, from June 18, 2016, onward have applied or wish to apply for CBLTCSS because they wish to obtain Medicaid-funded personal care service from any one or more MTLC partial capitation plans — that had, have and will have contracts with the State Defendant — and who have been found eligible for CBLTCSS by a CFEEC from June 18, 2016, through May 15, 2022, or a CFEEC equivalent from May16, 2022, onward, who have received or will receive initial pre-enrollment offers for personal care service hours from RiverSpring, and who chose or choose to enroll with RiverSpring for such personal care services, and received or will receive such services.

> **Subclass B:** All past, present and future New York State Medicaid recipients who, from June 18, 2016, onward have applied or wish to apply for CBLTCSS because they wish to obtain Medicaid-funded

Ms. Bellin argued that she and the members of the proposed classes met typicality and commonality requirements, i.e., that the putative class members were all challenging the same behavior of the Defendants — the failure of the Defendants to afford Medicaid recipients the right to appeal initial pre-enrollment determinations by MLTCs and the failure of Defendants to provide the applicants

---

personal care services from MLTC partial capitation plans — that had, have and will have contracts with the State Defendant — and who have been found eligible for CBLTCSS by a CFEEC from June 18, 2016, through May 15, 2022, or a CFEEC equivalent from May 16, 2022, onward, who have received or will receive initial pre-enrollment offers for personal care service hours from any one or more MLTC plans, and who chose or choose to enroll with an MLTC plan for such personal care services, and received or will receive such services and who were or are, or will be dissatisfied their initial authorizations for personal care services and wanted to or will want to challenge those authorizations.

**Subclass C:** All past, present and future New York State Medicaid recipients who, from June 18, 2016, onward have applied or wish to apply for CBLTCSS because they wish to obtain Medicaid-funded personal care service from any one or more MTLC partial capitation plans — that had, have and will have contracts with the State Defendant — and who have been found or will be found eligible for CBLTCSS by a CFEEC from June 18, 2016, through May 15, 2022, or a CFEEC equivalent from May16, 2022, onward, who have received or will receive initial pre-enrollment offers for personal care service hours from RiverSpring, and who chose or will choose to enroll with RiverSpring for such personal care services, and received such services and who were or are or will be dissatisfied with their initial authorizations for personal care services and would like to challenge those authorizations.

Dkt. No. 116 at 4, 11.

notice of that right to appeal. Dkt. No. 95 at 19. She maintained that the common questions of law included (1) whether the proposed class members have a property right in the amount of Medicaid-funded personal care services they are entitled to receive from the Medicaid program; (2) whether they have a right under the Due Process clause of the 14th Amendment to appeal the MLTCs's determinations of the amount of personal care services they have been awarded; and (3) whether they have a Due Process right to receive notice of a right to appeal those determinations. District Court Dkt. 95 at 19-20. For these classes, the common relief Ms. Bellin sought from the Court was a declaratory judgment and injunctive relief. *Id.* at 19-20.

On September 30, 2022, Judge Hellerstein denied Ms. Bellin's motion for class certification. *Bellin v. Zucker*, 2022 WL 4592581 (19 Civ. 5694) (S.D.N.Y. 2022). Rather than analyzing whether any or all of Ms. Bellin's proposed redefined classes should be certified, Judge Hellerstein ignored those redefinitions and created his own class definition — "individuals who applied for personal care services with MLTC's and were not given an adequate level of hours." *Id.* at *5 (internal quotation marks omitted). This is a class that by its own terms would be impossible to ascertain or certify (discussed further below). After creating this spurious class definition, the Court actually ruled that his own newly defined class could not be ascertained or certified.

32

Judge Hellerstein ruled that the class was not ascertainable because (1) "[c]lass membership depends on whether the initial awar[d] of care hours was 'adequate'"; (2) "adequacy is a subjective criterion that turns on an individual's perception of her need for care - that is whether she *believed* that the initial hours awarded were inadequate"; and (3) "[t]here is no objective independent basis for determining whether an award was adequate." *Id.* at *5.

Judge Hellerstein added that even if individuals in the class could self-identify by stating dissatisfaction with their initial award of personal care services, the class would still not be ascertainable because "a mere perception that an initial award of care hours was [] inadequate does not establish a due process violation." *Id.* at *6. Judge Hellerstein went on to compare Ms. Bellin's situation — where she was awarded eight hours a day of personal care services, but sought 24 — with a person who was awarded 10 hours a day of personal care services and sought 12. *Id.* Pointing to the balancing test for determining whether a due process violation has occurred —which, among requires the balancing of the interest sought to be protected, the risk of erroneous deprivation under current procedures, and the cost of additional procedures to protect that interest — Judge Hellerstein maintained that the effect of the person awarded 10, but denied 12 hours of care, "m[ight] not be as devastating" as the effect on Ms. Bellin of being denied 24 hours of care. Accordingly, Judge Hellerstein concluded that "to ascertain the class, [he] would

33

have to distinguish between individuals like Plaintiff and the [person] described above, requiring [him] to undertake the cumbersome process of inquiring into and conducting a mini-hearing on the merits of every potential class member's claim." *Id.* The requirement of such mini-hearings, Judge Hellerstein reasoned, would render the very class he defined unascertainable and therefore, uncertifiable. *Id.*

Accordingly, Judge Hellerstein denied Ms. Bellin's motion for class certification. *Id.*

## G. The Parties Cross-Motions for Summary Judgment and Judge Hellerstein's Decision

After completion of discovery, the parties cross-moved for summary judgment. On February 1, 2024, Judge Hellerstein granted Defendants' motion for summary judgment and denied Ms. Bellin's motion for summary judgment. *Bellin v. Zucker*, 2024 WL 381022 (S.D.N.Y. 2024).

Judge Hellerstein first ruled that "[w]hile [New York's] "statutory and regulatory process guides assessors in obtaining inputs, the decision of what and how much care to provide is shaped by a nurse assessor's clinical judgment." *Id.* at *3. Judge Hellerstein went on to conclude that "[t]here is not a mandated administrative outcome, as defined by the Second Circuit, giving rise to a property interest. *Id.* Instead much of the care plan is developed using the assessor's discretion, as shown through the requirements that the nurse assessor must come to a care conclusion on the basis of not only answers to prescribed questions, but also

34

what she sees, the discussions she has with family, care providers and the potential enrollees, and how she evaluates all of this information holistically." *Id.*

Judge Hellerstein next rejected Ms. Bellin's argument that the statutory and regulatory rules concerning 24-hour care were "more stringent, meaningfully channeling the nurse assessors' discretion." *Id.* Contending that these rules only come into effect after a nurse assessor, utilizing a "subjective, holistic process[,]" determines that a Medicaid recipient requires 24-hour care, Judge Hellerstein held that these rules are not as a basis for finding a property right in 24-hour personal care services. *Id.*

Finally, Judge Hellerstein rejected Ms. Bellin's argument that the State Defendant's fair hearing decisions demonstrated a consistent pattern of the mandatory award of 24-hour personal care service for Medicaid recipients who satisfy one of the two six-part tests described above. *Id.* at *4. Judge Hellerstein maintained that the fair hearing decisions were "fact intensive" such that there supposedly was "no consistent pattern which points to the existence of a property right." *Id.* In a further attempt to support this conclusion, Judge Hellerstein pointed out that there were hundreds of fair hearing decisions that affirmed assessors' denials of 24-hour personal care services. *Id.*

On February 5, 2024, Ms. Bellin filed her notice of appeal. JA4136-JA4137.

# ARGUMENT

**I.**  **MS. BELLIN HAS A PROPERTY INTEREST IN TWENTY-FOUR-HOUR PERSONAL CARE SERVICES BECAUSE THE STATUTES, REGULATIONS, POLICY DIRECTIVES, AND FAIR HEARING DECISIONS GOVERNING THE AWARD OF SUCH SERVICES MEANINGFULLY CHANNEL OFFICIAL DISCRETION AND MANDATE A DEFINED ADMINISTRATIVE OUTCOME**

**A.**  **This Court's Recent Decision in *Barrows v. Becerra*, which Found a Property Interest in Medicare Part A Benefits, and therefore, a Right to Appeal from a Denial of those Benefits, Controls Here.**

As this Court has recently reaffirmed regarding the long-standing test for the existence of a property interest in a government benefit, "[t]o have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Barrows v. Becerra*, 24 F.4th 116, 139 (2d Cir. 2022) (internal quotation marks omitted). "A benefits regime . . . creates a 'legitimate claim of entitlement' when statutes and regulations governing the distribution of benefits meaningfully channel official discretion by mandating a defined administrative outcome." *Id.* (discussing qualifying for Medicare Part A benefits for certain hospital stays) (internal quotation marks omitted). In pertinent part, this Court reiterated, "even though an official may have to 'use judgment in applying' a standard, that [fact] does not preclude the existence of a protected interest." *Id*. This is true for this case, which involves another benefit regime, Medicaid.

36

This Court's recent decision in *Becerra* is instructive**. In** *Becerra*, the plaintiffs were hospital patients who had been determined by their treating physicians to require hospital inpatient care that spanned two midnights, a determination that would entitle the patients to Medicare Part A benefits. *Id.* at 125-27. However, for these patients, hospital utilization review committees ("URCs"), which hospitals must have pursuant to federal law, had reviewed physicians' decisions and changed the patients' designations from inpatients to outpatients receiving "observation services," thereby depriving the patients of Medicare Part A benefits. *Id.*

Because there existed no appeals process through which these patients could challenge their redesignations by the URCs, a class of these patients sued the Secretary of the Department of Health and Human Services (the "Secretary") claiming that they had been deprived of property without due process of law in violation of the Fifth Amendment to the United States Constitution. *Id* at 126.[15] After a trial, the district court found that (i) the class members had a property interest in the Medicare Part A benefits; (ii) that the class members were deprived of that interest when the hospital utilization committees changed their designations from inpatients to outpatients; and (iii) that deprivation occurred without due

---

[15] Procedural due process protections are the same under the Fifth and Fourteenth Amendments to the United States Constitution. *See, e.g., English v. District of Columbia*, 717 F.3d 174, 972 (D.C. Cir. 2013).

process of law because class members could not appeal those redesignations. *See id.* at 127. As a result, the district court issued an injunction ordering the Secretary to create a process for members of the class to appeal their reclassification decisions. *Id.*

The Secretary appealed, claiming, among other things, that the class members did not have a property interest in Medicare Part A benefits. The Second Circuit disagreed and affirmed the trial court. *Id.* at 139-40.

This Court affirmed the District Court's finding that "the regulatory scheme viewed as a whole, including CMS's sub-regulatory guidance, its enforcement practice, and other statutory provisions," mandated a result. *Id.* at 139.[16] That is, when hospital patients were determined to require medically necessary hospital inpatient care that spanned two midnights— i.e., when they satisfied Medicare's Two-Midnight Rule — they were required to be provided with Medicare Part A benefits. *Id.* at 139-40. This Court therefore concluded that "the Two Midnight Rule and its surrounding guidance 'mandate[ ] a defined administrative outcome' in terms of Part A coverage such that a Medicare beneficiary has a legitimate claim of entitlement to that coverage." *Id.* at 140.

---

[16] CMS is the acronym for the Centers for Medicare and Medicaid Services, a part of the United States Department of Health and Human Services.

38

Significantly, this Court rejected the Secretary's argument that because physicians on the URCs use medical judgment, or discretion, to determine whether the treating physicians correctly admitted the patients for the relevant two midnights, this precluded the finding of a property interest. On the contrary, this Court held that this discretion was "adequately channeled for the purposes of discerning a property interest." *Id.* More specifically, this Court held that

> the[] [URC physicians'] use of judgment to make that determination does not mean their discretion is not adequately channeled for purposes of discerning a property interest. When [the URC] uses judgment in applying the standards set by the state, so long as an administrative action is "*required* after the [URC] determines (*in its broad discretion*) that the necessary prerequisites exist," a property interest exists in the benefits regime. Here, after the URC physicians use their medical judgment in determining that the requirements of the Rule are met, the services provided to the patient are considered appropriate for coverage under Medicare Part A.

*Id.* (emphasis in original and added). Accordingly, this Court concluded that the class members "ha[d] a property interest in coverage under Medicare Part A that is cognizable under the Due Process Clause." *Id.*

*Becerra*, *id.* at note 136, relies in part on the longstanding precedent of the Supreme Court in *Board of Pardons v. Allen*, 482 U.S. 369 (1987), which issued a similar ruling on a liberty interest. In *Allen*, the Court described Montana's existing 14-factor test for determining whether to award a prison inmate parole as "necessarily subjective. . . and predictive," and emphasized that the discretion of the Parole Board "was very broad." *Id,* at 374, 378 n.9, 381. The specific

39

subjective and predictive factors noted by the Court were the "impact of release on both the prisoner and the community," "the prisoner's ability to lead a law-abiding life," and "whether the release can be achieved without detriment to ... the community." *Id.* at 379-80. Nevertheless, the Court held that prison inmates had a liberty interest in parole protected by the Due Process clause because the Montana statute made the granting of parole mandatory upon certain findings. *Id,* at 377-78, 380-81.[17]  *See also Greenholtz v. Nebraska Penal Inmates*, 442 U.S.1, 9-13 (1979) (finding liberty interest in parole even though "[t]he parole-release decision. . .depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release.").

The instant case is on all fours with *Becerra*. As in *Becerra*, and as described in detail in section A in the Statement of the Case above, the statutes, regulations, and policy directives governing the award of the two different forms of 24-hour personal care services, when read together, set forth objective criteria that,

---

[17] The Supreme Court and this Court uses the same analysis to determine liberty and property interests under the Due Process Clause. *E.g., See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) ("This analysis as to liberty parallels the accepted due process analysis as to property."); *Becerra*, 24 F.4th at 139 n.129 (citing *Bd. of Pardons, supra*).

if satisfied, mandate the provision of 24-hour personal care services. New York Appellate authority concerning the award of 24-hour personal care services makes this clear. *See Gurariy v. Zucker*, 196 A.D.3d 574, 577-78 (2d Dept. 2021) (awarding continuous personal care services to the appellant because the appellant satisfied "the criteria for personal care services" contained in 18 N.Y.C.R.R. § 505.14(a)(2) and reversing the State Defendant's ruling to the contrary).

Judge Hellerstein's rejection of *Becerra* as controlling in this case — because New York's regulations and administrative directives concerning the award of 24-hour personal care services purportedly only come into effect *after* a nurse assessor has subjectively determined that 24-hour care is required — is demonstrably incorrect.[18] As discussed in detail in Section A above, New York's rules and administrative directives require nurse assessors to evaluate specific criteria to determine whether Medicaid recipients are entitled to 24-hour personal care services. Specifically, the nurse assessor must, among other things, assess and document:

_____

[18] Contrary to Judge Hellerstein's assertion, Ms. Bellin has never conceded otherwise. Rather, Ms. Bellin stated below that "[w]hen *the assessment makes clear* that the applicant needs some form of twenty-four-hour care . . . the agencies must discard any reference to a task-based tool." District Court Docket ("Dkt") No. 160 at 16. Moreover, immediately before that quote, Ms. Bellin specifically asserted that "[b]efore using such tools, all plans must evaluate and document when and to what extent the enrollee requires assistance with IADLS and ADLs and whether needed assistance can be scheduled or may occur at unpredictable times during the day or night." *Id.* at 15-16.

(*1*) whether the practitioner's order indicated a medical condition that causes the individual to need frequent assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding;

(*2*) the specific personal care functions with which the individual needs frequent assistance during a calendar day;

(*3*) the frequency at which the individual needs assistance with these personal care functions during a calendar day;

(*4*) whether the individual needs similar assistance with these personal care functions during the individual's waking and sleeping hours and, if not, why not;

and

(*5*) whether, were live-in 24-hour personal care services to be authorized, the personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

18 N.Y.C.R.R. § 505.14(b)(2)(iii)(d)(*1-5*) (2021); 18 N.Y.C.R.R. §

505.14(b)(4)(i)(*c*)(*2*)(*i-v*) (2016); MLTC Policy Directive 16.07 (Ex. 15) at 1;

Policy Directive GIS12 MA/026 (Ex. 12) at 1-2; *Gurariy,* 196 A.D.3d at 577-78 —

(reviewing such factors to determine whether Medicaid recipient was entitled to

continuous, 24-hour personal care services).  *See generally* 18 N.Y.C.R.R. §

505.14(b).

Moreover, Judge Hellerstein incorrectly concluded that *Becerra* is

distinguishable from this case based on his mistaken belief that, unlike in this case,

a property interest existed in *Becerra* because there was only "one simple input" —

42

a patient requires inpatient treatment spanning two midnights — leading to a mandated outcome — the treatment is covered by Medicare Part A. 2024 WL 381022 at *3.

This conclusion misstates the *Becerra* holding. That case was not about one simple input. Rather, this Court found a property interest in Medicare Part A benefits despite the fact that there exist numerous factors that the reviewing physicians, using their discretion and professional judgment, must consider when determining whether a particular patient requires hospital care that crosses two midnights. *Becerra,* 24 F.4th at 140. Those factors will necessarily vary depending on the type of illness that has brought the patient to the hospital and include, but are not limited to the severity of that condition, the patient's age, the patient's other health conditions, medications the patient is taking, and a plethora of other considerations. Notwithstanding the huge variety and complex nature of the factors, *Becerra* did not require any special channeling of those factors to find a property interest in Medicare Part A benefits. *Id.* (rejecting the Secretary's contention that because URC committees used their unchanneled medical judgment to determine whether patients would require care that spanned two midnights, the patients had no property interest in Medicare Part A benefits). Rather, *Becerra* ruled on the final result: that because satisfaction of the Two-Midnight rule mandated the provision of Medicare Part A benefits, the URCs'

43

physicians' discretion was sufficiently channeled by that rule so as to create a property interest in those benefits. *Id.*

Moreover, neither this Court nor the Supreme Court has ever required such a simplistic approach to finding a liberty or property interest. *See* e.g., *Allen*, 482 U.S. at 377-81 & n.9 (recognizing a liberty interest in parole where three criteria had to be satisfied and the determination of whether such criteria were satisfied was based on 14 factors that the parole board was required to consider). Here, as discussed in detail above, the two six-part tests required by regulation and state policy directives, are substantive, objective predicates to the mandatory provision of the two forms of 24-hour personal care services, i.e., these tests contain factors that must be considered to determine whether 24-hour care is "medically necessary" to maintain the health and safety of the Medicaid recipients in their homes within the meaning of New York law.[19] If the applicant meets the standards

___

[19] Judge Hellerstein's description of the use of the CHA to determine personal care service hours as "subjective," 2024 WL 381022 at *3, is completely contradicted by the record below, which demonstrates that the CHA is a standardized tool that is used to collect factual information about the ability of a Medicaid recipient to perform ADL' and IADLs and is supposed to be "as objective as possible." JA2628:4-22; JA2624:25-JA2625:9, JA2633:9-2634:21, JA2639:24-JA2640:24; JA 2301-98; JA2400-2505. In any event, even if some of the standards for determining whether a Medicaid recipient is entitled to 24-hour personal care services were subjective — which they are not — that would not prevent this Court from finding a property right in such services. *E.g., Allen*, 482 U.S. at 377-80 (finding liberty interest despite purely subjective considerations); *Greenholtz*, 442 U.S. at 9-13 (same).

in one of the two six-part tests, provision of 24-hour personal care service is mandatory. Accordingly, Judge Hellerstein erred when he improperly distinguished *Becerra* and refused to find a property interest in 24-hour personal care services.

**B.** **The State Defendant's Medicaid Fair Hearing Decisions Show a Consistent Pattern of Mandating the Award of 24-Hour Personal Care Services for Medicaid Recipients Who Satisfy One of the Two-Six-Part Tests, Thereby Demonstrating a Property Interest in Such Services**

Although property interests protected by the Due Process Clause are most commonly created by statutes, regulations, or other formal policies, they may also be established through such diverse sources as unwritten common law and informal institutional policies and practices. *Furlong v. Shalala*, 156 F.3d 384, 395 (2d Cir. 1998) (citing *Perry v. Sindermann,* 408 U.S. 593, 602-03 (1972)). In *Furlong,* this Court held that a "constant, persistent pattern of ALJ decisions" about the challenged Medicare issue in that case was sufficient to create a property interest in and of itself.

In *Furlong*, the ALJs were "statutorily charged with interpreting Medicare law. As such, their extensive experience in dealing with that statute, combined with the *succession of decisions consistently overturning application of the [challenged] rule*," created a body of law that constituted "persuasive authority [on how the defendant] interpret[ed] Medicare law." *Id.* at 395-96 (emphasis added). Similarly,

45

under New York Law, an administrative agency "can develop[] [a] policy as a

common law court does through *ad hoc* adjudications [, i.e., fair hearings,] that

must comport with the 'underlying precept . . . that in administrative, as in judicial

proceedings, justice demands that cases with like antecedents should breed like

consequences.'" *Leggio v. Devine*, 34 N.Y.3d 448, 461-62 (2020) (quoting *Matter

of Charles A. Field Delivery Serv.*, 66 N.Y.2d 516, 519 (1985) and recognizing

administrative agency policy developed through fair hearing decisions).

 In remanding this case for further proceedings to the district court, this Court

previously acknowledged that Plaintiff was on the verge of demonstrating that the

State Defendant's fair hearing decisions confirmed that Ms. Bellin had a property

interest in 24-hour personal care services. *Bellin v. Zucker*, 6 F.4th 463, 480-81 (2d

Cir. 2021). First, this Court noted that Ms. Bellin's own fair hearing decision

showed that the ALJ found that she was conclusively entitled to 24-hour live in

care based on the evidence presented at the hearing. *Id.,* referring to Doc. 164-1 at

14. More importantly, this Court reviewed other fair hearing decisions submitted

by Ms. Bellin, noting that "[t]he fact that administrative review is possible for such

similar claims supports Bellin's claim that beneficiaries have a property interest in

the initial determination of their personal care services hours." *Id.* at 480. The

Court further noted that the decisions reflected "an apparent practice in the

Department of Health of reviewing MLTCs' assessments and concluding based on

the satisfaction of certain criteria that beneficiaries are entitled to a specific number of personal care services hours." *Id.* at 480-81. In other words, the reversals in the fair hearing decisions showed that the provision of service was mandatory upon the satisfaction of prescribed criteria. *See id.* at 480).

As discussed in Section B of the Statement of the Case above, in order to demonstrate what this Court suggested, Ms. Bellin presented Judge Hellerstein with a group of 108 Fair Hearing decisions, rendered by the State Defendant, that reversed MLTCs' refusals to provide 24-hour personal care services. These decisions, JA3937-JA4029, demonstrate conclusively that the provision of 24-hour personal care service, whether live-in or split shift, is mandatory when the applicant satisfies specific criteria. These decisions consistently fall into only a few standard fact patterns that relate to the requirements set forth in the six-part tests and do not rely on extraneous facts about the applicants' lives that do not affect whether the applicants meet those requirements. The standard fact patterns are as follows:

(1) the MLTCs denies an individual's request for more hours to cover increased toileting needs because the individual can allegedly rely on "incontinence supplies" to "keep dry" without help with changing, but the evidence shows that that these "supplies" will not keep the individual dry and that the individual needs help in changing;

47

(2) the plan denies the request for more hours to prevent falls while ambulating to the toilet because the MLTC alleges that the appellant is asking for "companionship" or "standalone safety monitoring," but the evidence shows that the appellant really does need help with ambulation and toileting;

(3) the plan denies the increases because the individual has allegedly not shown a change in his or her condition, but the evidence shows that the individual's condition has deteriorated;

(4) the plan denies an increase by relying on a "tasking tool," but the evidence shows that the plan was aware that the individuals had 24 hour needs when the use of tasking tools is forbidden;

(5) the plan denies a request for increased hours claiming that the individual has "support" from family, but the evidence shows that no such support exists; and

(6) the plan denies an increase to split-shift alleging that there is insufficient frequency of nighttime needs, but the evidence shows that nighttime needs were frequent such that a live-in aide cannot get five hours of uninterrupted sleep. *See* Section B of the Statement of the Case. Many of the 108 decisions involve more than one of the above fact patterns, making it even more clear why the plans were reversed.

Significantly, Ms. Bellin has not been able to find, and Defendants have not been able to cite, a single fair hearing decision that denied 24-hour personal care service when one of the two six-part tests was satisfied.

As is apparent, Judge Hellerstein's contention that the fair hearing decisions were so "fact intensive" that there is "no consistent pattern which points to the existence of a property right," is simply incorrect. As a matter of administrative stare decisis, New York law requires the State Defendant to increase personal care services to 24-hours a day when Medicaid beneficiaries demonstrate circumstances and evidence similar to that reflected in the categories of cases described above. *See Leggio*, 34 N.Y.3d at 461-62. And, those cases reflect that satisfaction of one of the two six-part tests described above mandates the provision of one of the two forms of 24-hour a day personal care services. Accordingly, Ms. Bellin has a property interest in those services.

Similarly mistaken is Judge Hellerstein's conclusion that the existence of numerous fair hearing decisions that uphold MLTCs' denials prove the lack of a property right in personal care services. Under every public welfare regime, there necessarily exist cases in which administrative law judges uphold welfare agencies' refusals to increase benefits because those agencies correctly concluded that the beneficiaries do not satisfy the criteria for such increases.

49

To the extent that Judge Hellerstein concluded that Ms. Bellin ignored the decisions where the Plans prevailed, Ms. Bellin denies this. To support our position, we have compiled an additional set of 15 decisions—where the MLTC plans were affirmed.[20] These decisions also turn on the same types of categories mentioned above and show that applicants lose their hearings not because of alleged "discretion," in the form of arbitrary decision-making by the plans, but rather because the applicants failed to provide sufficient evidence. AD057-AD-76.[21] More particularly, in the context of denials of requests for increases to 24-hour personal care services, Medicaid beneficiaries are denied those increases when they fail to present sufficient evidence that they satisfy the criteria for such increases. *See* AD057-76, with details below. But that does not mean that the agencies' and the ALJs' discretion in making those determinations was not meaningfully channeled.

For example, several cases show that the Plans were affirmed where they deny an increase based on the failure to demonstrate a medical need. In many cases, the applicants were simply asking for standalone safety monitoring, a service not provided in this program. AD-058, AD-059-AD-060, AD-060-AD-

---

[20] This Court may take judicial notice of these fair hearing decisions on appeal. *Bellin v. Zucker*, 6 F. 4th 463, 471 at n. 10 (2d Cir. 2021).

[21] Citations to "AD-" are to the Addendum to the instant brief.

50

061, AD-061-AD0-63, AD-063-AD-064, AD-064-AD-065, AD-067-AD=-69, AD-069-AD-070, AD-070-AD-071, AD-072, AD-073, AD-074-AD0=75. Some cases show that the applicant asked for a different prohibited task, in this case, help with oxygen. AD-073-AD-074. Personal care aides are not permitted to help with oxygen. In another case, the applicant's daughter-in-law asked for split-shift care because she "preferred" it to the live-in care that was offered. AD-075-AD-076. Here too the Plan was affirmed. In another case, simply no night needs were shown. AD-066-AD-067.

In sum, the record below conclusively demonstrate that Ms. Bellin has a property interest in 24-hour personal care services, and there is no issue of fact that undermines that conclusion.

## II. THE REVISED MAIN CLASS AND SUBCLASSES PROPOSED BY MS. BELLIN WERE PLAINLY ASCERTAINABLE. ACCORDINGLY, JUDGE HELLERSTEIN ERRED WHEN HE REFUSED TO CERTIFY THE PROPOSED REVISED MAIN CLASS AND THE SUBCLASSES FOR LACK OF ASCERTAINABILITY

As discussed above, Ms. Bellin proposed four redefined classes in her reply briefing in the court below. However, rather than analyzing Ms. Bellin's proposed revised definitions, Judge Hellerstein manufactured his own single class definition — "individuals who applied for personal care services with MLTC's and were not given an adequate level of hours" — and then proceeded to find his own class unascertainable and therefore uncertifiable. Judge Hellerstein's denial of Ms.

51

Bellin's class certification motion for lack of ascertainability — given that he manufactured the class that he found unascertainable — was an abuse of discretion and should be reversed. Moreover, the revised classes proposed by Ms. Bellin were plainly ascertainable and satisfied the commonality and typicality requirements of Rule 23.

### A. Ms. Bellin's Proposed Revised Classes Are Ascertainable and Also Satisfy the Commonality and Typicality Requirements of Rule 23

"The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries. This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). *Accord Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018).

Under these standards the revised Main Class and Subclass A are clearly ascertainable. Membership in all of Ms. Bellin's proposed revised classes Main Class and Subclass A can be established using the objective criteria contained in their definitions.[22]

---

[22] Although Ms. Bellin has no obligation at this juncture to prove that the proposed classes are administratively feasible, *Petrobras*, 862 F.3d at 268-69; *Langan*, 897 F.3d at 91 n.2, Ms. Bellin wishes to note that the identities of the members of the Revised Main Class and Subclass A can be determined, respectively, from

Judge Hellerstein's ruling is erroneous for another reason. He focused improperly on the differences among potential class members who might have been denied different numbers of hours, leading to a discussion of the process due these individuals. That was not a question of ascertainability. This contention is really about a purported lack of commonality and typicality among proposed classes' members and Ms. Bellin. And here, Judge Hellerstein erroneously failed to perceive that he should not be focusing on the differences in the amounts of service sought by potential class members, but rather the injury experienced by *all of them*—the lack of appeal and notice rights. And clearly, as we discuss below, Ms. Bellin's proposed revised classes satisfy the commonality and typicality Requirements of Rule 23.

---

Zucker's records of persons who received personal care services and from MLTCs and RiverSpring's records of who received personal care services through them. While Defendants maintained below that because they do not keep records of who wished to appeal initial personal care service determinations, Revised Subclasses B and C are not administratively feasible, purported members of those classes can prove their membership with affidavits stating that they were, or are dissatisfied their initial authorizations for personal care services and wanted to, or want to challenge those authorizations. This Court has repeatedly approved the use of affidavits to prove class membership. *Petrobras Sec.*, 862 F.3d at 267 (citing approvingly, *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014), permitting purported class members to prove class membership with affidavits to indicate when and where they purchased olive oil); *Langan*, 897 F.3d at 91 n.2 (permitting purported class members to prove class membership through affidavits concerning the time frame in which they purchased the subject bath product.).

As to commonality, Rule 23(a)(2) requires that there be "questions of law or fact common to the class." "What matters to class certification is not the raising of common questions ... but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). *Accord Becerra*, 24 F.4th at 131. To prove "commonality," a plaintiff must "demonstrate that the class members have suffered the same injury" and that the claims asserted "depend upon a common contention . . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 349-50. The commonality requirement is "easily met in most cases," especially where the "party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action. . . ." Newberg on Class Actions § 3.20 & nn.6, 7 (6th Ed.) (citing cases). Significantly, this Court has ruled that the fact "[t]hat the injury arising from the absence of an appeals process may manifest itself differently depending on a beneficiary's medical situation does not defeat the commonality of the class's injury." *Becerra*, 24 F.4th at 131 (upholding commonality finding for class of persons who were denied the right to appeal disqualification for Medicare Part A benefits despite their differing medical situations).

54

"Typicality" under Rule 23(a)(3) "requires that the claims of the class representatives be typical of the claims of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.) (internal quotation marks and citation omitted), *cert denied*, 520 U.S. 1211 (1997). *Accord Becerra*, 24 F.4th at 131. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3). The crux of both requirements is to ensure that maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marisol A.*, 126 F.3d at 376 (internal citations and quotation marks omitted). *Accord Elisa W.*, 82 F.4th at 128.

Here, Ms. Bellin, and the members of the proposed revised Main Class and Subclasses are challenging the same behavior of the Defendants — (1) the failure

of the Defendants to afford MLTC enrollees the right to appeal initial pre-enrollment determinations by MLTCs of their awards of personal care services; and (2) the failure of Defendants to provide MLTC enrollees notice of that right to appeal. The common questions of law include (1) whether the Main Class's and the Subclasses' members have a property right in the amount of Medicaid-funded personal care services they were, are or will be awarded; (2) whether they have a right under the Due Process clause of the 14th Amendment to appeal the MLTCs' determinations of the amount of personal care services they have been awarded; and (3) whether they have a Due Process right to receive notice of a right to appeal those determinations. Moreover, the answers to these questions of law for the Main Class and the three Subclasses are capable of being resolved in "one stroke." *Wal-Mart*, 564 U.S. at 350.

Furthermore, regardless of the varying number of personal care hours each class member might claim that the Defendants wrongfully denied them in Defendant's initial determination, the injury of each of class member is the same — being denied the right to appeal the number of medically necessary personal care hours they need to maintain their health and safety at home, and notice of that right.

In any event, even if the injury suffered by the Class and Subclass members did "manifest itself differently depending on a beneficiary's medical situation" —

which it does not — this Court has held that this "[would] not defeat the commonality of the [injury suffered by the Main Class and he Subclasses]." *Becerra*, 24 F.4th at 131 (holding the same regarding denial of right to appeal varying levels of Medicare Part A benefits). The same reasoning renders Ms. Bellin's claim typical of the members of the Main Class and Subclass. *Id.* at 131-32 (claims of class representative typical even though the injury arising from the absence of an appeals process may manifest itself differently depending on a beneficiary's medical situation); *Elisa W.*, 82 F.4th at 128 ("[W]here the claims of a class stem from a single course of conduct, the commonality and typicality requirements of Rule 23(a) tend to merge.").

**B. Judge Hellerstein Abused His Discretion When He Ignored the Revised Class Definitions Proposed to Him by Ms. Bellin, Created his Own Faulty Class, and then Proceeded to Deny Class Certification to that Very Class for Lack of Ascertainability**

Judge Hellerstein's decision to ignore Ms. Bellin's revised class definitions — which plainly satisfy the ascertainability, commonality, and typicality requirements of Rule 23 (see Point II(A)) — and substitute his own faulty definition was an abuse of discretion. This Court has long held that "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993). *Accord Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984).

57

While a "court [deciding a class certification motion] need not take on an onerous burden of identifying issues that may be appropriate for class treatment," it is an abuse of discretion for a district court to fail to redefine proposed classes so that classes may be certified when doing so is not an "undue burden." *Robidoux*, 987 F.2d at 937 (reversing denial of class certification where district court failed to redefine class where it would not have been an undue burden to do so). *See Boucher v. Syracuse Univ.*, 164 F.3d 113. 118-19 (2d Cir. 1999); *Mazzei v. Money Store*, 829 F.3d 260, 273 (2d Cir. 2016). A fortiori, it is an abuse of discretion for a court to ignore proposed revised class definitions by a purported class representative and not rule on the certifiability of those proposed classes.

Here, Ms. Bellin did not even rely on Judge Hellerstein to create a revised class definition. Rather, Ms. Bellin asked Judge Hellerstein to rule on the certifiability of her proposed revised class definitions. Therefore, there was no burden at all on Judge Hellerstein to "identify[] issues that may be appropriate for class treatment[,]" let alone an "undue burden." *Robidoux*, 987 F.2d at 937. Accordingly, Judge Hellerstein abused his discretion when he refused to render a ruling on whether Ms. Bellin's proposed revised classes could be certified.

Moreover, Judge Hellerstein further abused his discretion by proposing a spurious class definition. Judge Hellerstein's proposed definition — "individuals who applied for personal care services with MLTC's and were not given an

58

adequate level of hours" — is faulty on its face. In essence, Judge Hellerstein was improperly requiring potential class members to prove that they would have prevailed at a fair hearing regarding their personal care hours in order to join a class challenging the Defendant's failure to provide them with a fair hearing in the first place. That requirement flies in the face of well-settled precedents of the Supreme Court and this Court. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 87 (1972) ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result . . . ."). *Accord Kapps v. Wing*, 404 F.3d 105, 116-17 (2d Cir. 2005) (citing *Fuentes*); *Brody v. Village of Port Chester*, 345 F.3d 103, 112-13 (2d Cir. 2003) (Sotomayor, J.). Accordingly, Judge Hellerstein's faulty class definition must be rejected.

\*     \*     \*

In sum, the revised class definitions proposed by Ms. Bellin were ascertainable and satisfied the commonality and typicality requirements of Rule 23. By ignoring Ms. Bellin's proposed revised class definitions, defining a faulty class, and then denying certification of that very class due to lack of ascertainablity, Judge Hellerstein abused his discretion. This Court should find that Ms. Bellin's proposed revised classes are ascertainable and satisfy the commonality and

59

typicality requirements of Rule 23, and should remand this case to the district court for further consideration of whether the proposed revised classes, and any other classes Ms. Bellin may propose, should be certified.[23]

---

[23] On remand, Ms. Bellin plans to propose additional new subclasses limited to persons who were awarded personal care hours in their MLTC's initial determinations, but who wish to appeal to obtain split-shift or live-in 24-hour care.

## **CONCLUSION**

For all the reasons set forth above, this Court should reverse Judge Hellerstein's grant of summary judgement to Defendants, grant summary judgment to Ms. Bellin on the issue of the existence of a property interest in 24-hour personal care services, and remand this case to the district court for a determination on whether Ms. Bellin is entitled to summary judgment on her Due Process claim. In addition, this Court should reverse Judge Hellerstein's denial of Ms. Bellin's motion for class certification based on lack of ascertainability, find that Ms. Bellin's proposed revised classes are ascertainable and satisfy the commonality and typicality requirements of Rule 23, and remand this case to the district court for further consideration of whether the proposed revised classes, and any other classes Ms. Bellin may propose, should be certified.

Dated: New York, New York
     May 17, 2023

Respectfully submitted,

KATSKY KORINS LLP

*/s/ Aytan Y. Bellin*     '
By: Aytan Y. Bellin
605 Third Avenue, 17th Floor
New York, New York 10158
(212) 716-3229
abellin@katskykorins.com

Nina Keilin, Esq.

61

225 Broadway, Suite 1803
New York, New York 10007

*Attorneys for Plaintiff-Appellant Rosalind Bellin*

## <u>STATEMENT OF RELATED CASES</u>

Plaintiff-appellant Rosalind Bellin is unaware of any related cases pending

in this Court.

Dated:  May 17, 2024

                               */s/ Aytan Y.  Bellin*
                                   Aytan Y.  Bellin
                                KATSKY KORINS LLP
                                605 Third Avenue, 17th Floor
                                New York, New York 10158
                                Tel: (212) 716-3229
                                Email: abellin@katskykorins.com

                                *Counsel for Plaintiff-*
                                *Appellant Rosalind Bellin*

## **CERTIFICATE OF COMPLIANCE**

This opening brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,986 words as determined by the word-count version of Microsoft Word 2016.

This opening brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, 14-point, Times New Roman typeface using Microsoft Word 2016.

Dated: May 17, 2024

                              */s/ Aytan Y. Bellin*
                              Aytan Y. Bellin
                              KATSKY KORINS LLP
                              605 Third Avenue, 17th Floor
                              New York, New York 10158
                              Tel: (212) 716-3229
                              Email: abellin@katskykorins.com

                              *Counsel for Plaintiff-Appellant Rosalind Bellin*

## <u>CERTIFICATE OF SERVICE</u>

I, Aytan Y. Bellin, certify that on May 17, 2024, I electronically filed this Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Aytan Y. Bellin*

Aytan Y. Bellin

# ADDENDUM

## TABLE OF CONTENTS FOR ADDENDUM

Opinion and Order Denying Motion for Class Certification………………..AD-001

Opinion Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motions for Summary Judgment……………..……………..AD-013

Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motions for Summary Judgment……………..……………..AD-022

U.S. Constitution, Amendment XIV…………..…………………………..AD-023

42 U.S.C. § 1983…………………………………………………………AD-024

18 N.Y.C.R.R. § 505.14 (2021)…………………………………………AD-025

18 N.Y.C.R.R. § 505.14 (2016)…………………………………………..AD-043

Fair Hearing Decisions Affirming Denials of Requests for 24-hour Personal Care Services………………………………………………………………AD-057

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ROSALIND BELLIN, et al., :

                                 :

               Plaintiffs, :     **ORDER AND OPINION**
                                 :     **DENYING MOTION TO**
                                 :     **CERTIFY CLASS**
       v.                            :

                                 :

HOWARD ZUCKER et al., :     19 Civ. 5694 (AKH)

                                 :

            Defendants. :

                                 :

------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This is a putative class action against the State of New York and Elderserve
Health, Inc. d.b.a. RiverSpring at Home ("RiverSpring"). RiverSpring is a third-party contractor
that provides personal care services to combination Medicare and Medicaid recipients. It does so
through Managed Long Term Care Plans ("MLTCs").

        Plaintiff Rosalind Bellin ("Plaintiff") alleges that RiverSpring and other similarly-
situated MLTCs' failure to provide an appeals process for new enrollees to challenge the
MLTCs' initial determination as to how many hours of care the enrollees are entitled to receive.
She alleges that the absence of a right to immediate appeal violates the Due Process Clause of
the Fourteenth Amendment.[1]

        I previously dismissed Plaintiff's claims, finding that she failed plausibly to allege
a property interest and due process right in an MLTC's initial determination of personal care
hours. *See Bellin v. Zucker*, 457 F. Supp. 3d 414 (S.D.N.Y. 2020). On appeal, the Second
Circuit reversed and held that Plaintiff plausibly had alleged a property interest; it remanded for

---

[1] The initial complaint also alleged violations of various federal statutes governing Medicaid recipients, but I held
that no right of appeal existed under the federal statutes. *See* ECF No. 64. Although the Second Circuit reversed my
dismissal of Plaintiff's claims under the Due Process Clause, it affirmed my ruling as to Plaintiff's claims under the
federal Medicaid statutes. *See* Mandate, ECF No. 68.

AD-001

consideration of whether to certify a class and, ultimately, for Plaintiff to prove that she had a property interest in the initial care hours determination and that New York's regime violates her due process rights. *See Bellin v. Zucker*, 6 F.4th 463 (2d Cir. 2021); *accord.* Mandate, ECF No. 68.

Before me now is Plaintiff's motion for class certification under Fed R. Civ. P. 23(b)(2) to address the common questions of whether she and proposed class members (1) have a property interest in the initial number of care service hours awarded; (2) a Due Process right to appeal that initial determination; and (3) right to notice of the right to appeal. (ECF No. 94.) She proposes one main class, comprised of new applicants for MLTC enrollment, meant to encompass those that have been or will be affected by the challenged policy, and three subclasses, (1) new applicants to RiverSpring; (2) individuals who would have wanted, want, or will want to appeal MLTC's preenrollment initial personal care services authorizations given the opportunity to do so; and (3) individuals that would have wanted, want, or will want to appeal RiverSpring's preenrollment initial personal care service authorizations given the opportunity to do so.

Defendants oppose certification on a number of grounds. First, they contend that Plaintiff and the class members lack Article III standing for want of a cognizable injury. Next, they attack the proposed classes, arguing that they are substantively overbroad and fail for want of ascertainability. Finally, they argue that Plaintiff has failed to establish that the requirements of Rule 23(a) or Rule 23(b)(2) are satisfied.

For reasons provided below, I hold that Plaintiff has Article III standing because the denial of a Due Process right, if established, is a legally cognizable injury. However, I agree with Defendants that the proposed classes are overbroad, and even though I may exercise my discretion to narrow the class, a class cannot be defined to satisfy the implied requirement of ascertainability. Accordingly, the motion is denied.

**AD-002**

# BACKGROUND

Under New York's statutory regime, individuals deemed eligible by New York State to receive personal care services must apply to and enroll in a Managed Long Term Care Plans ("MLTCs") to receive care. Would-be beneficiaries may apply to as many or as few MLTCs as they desire. Upon request, MLTCs evaluate the beneficiary and determine how many hours of care they would provide if the beneficiary were to enroll in their plan. If a beneficiary disagrees with an MLTC's initial pre-enrollment determination and believes she needs more hours than offered, however, she cannot appeal that decision under the current administrative regime. Instead, she must enroll in the plan and, at least initially, receive care at an inadequate level (perhaps supplementing with additional care at her own expense). Only then can she begin the process of obtaining the additional care she believes she needs. This requires that she first seek an initial (post-enrollment) determination and wait for the MLTC to rule on the request. If successful, will begin to receive care at the adjusted level. If the adjustment is denied, she may internally appeal to the MLTC, and if that appeal fails, she has recourse to appeal in the form of a New York State "fair hearing" under the State's Medicaid regulations. The rub with this system, and of which Plaintiff complains, is that she is forced to accept care at an inadequate level, or to supplement with private care and pay out of pocket, between the time she enrolls in the MLTC and the time of the MLTC's decision on her "initial determination." Although a beneficiary has a right to appeal the initial determination, a successful appeal will apply retroactively only to the date of the initial (post-enrollment) determination. She has no recourse to recover monies expended during the period between her enrollment and the initial (post-enrollment) determination.

Such was the case with Plaintiff. In April 2019, Plaintiff applied for care with RiverSpring. It offered to provide her with 8 hours of care, 7 days a week, a number she felt was too low. Nevertheless, Plaintiff formally requested enrollment on May 15, 2019 and began receiving care, 8 hours per day, on June 1, 2019. Plaintiff believed that she needed 24-hour care

AD-003

but could not appeal the initial (pre-enrollment) determination.  Instead, RiverSpring required

that she submit a request for increased hours, and upon RiverSpring's initial (post-enrollment)

determination, if dissatisfied, Plaintiff then would have the right to an appeal, and relatedly, the

right to have notice of her right to appeal.

Plaintiff did as instructed.  She accepted and receiving the 8 hours of care per day

that RiverSpring offered, and while awaiting RiverSpring's determination as to her request for

increased hours, supplemented that care, at her expense, to obtain the additional 16 hours per day

that she needed.  Although Plaintiff was ultimately successful in securing 24-hour care, the

benefits applied retroactively only to the date of RiverSpring's initial (post-enrollment)

determination on her request for increased hours, leaving her out-of-pocket for the monies

expended to supplement her care between the date of enrollment and the initial (post-enrollment)

determination.

On July 18, 2019, Plaintiff filed this putative class action alleging a violation of

her rights under the Due Process Clause of the Fourteenth Amendment, as well as under various

federal statutes governing Medicaid beneficiaries' right to appeal.  She sought declaratory and

injunctive relief on behalf of herself and a class of "current and future New York State Medicaid

recipients who have applied or will apply for Medicaid-funded personal care services from

MLTCs."  She sought to enforce the class members' rights to appeal MLTCs' initial personal

care hour determinations and to receive notice of those appeal rights, and to obtain an order that

RiverSpring provide notice of the right to appeal and to process any such appeals.

Plaintiff now moves for class certification, proposing one main class and three

subclasses as follows.

**Main Class**: new applicants for MLTC enrollment, meant to encompass those
that have been or will be affected by the challenged policy.
Subclass A: New applicants to RiverSpring.

4

**Subclass B**: Individuals who would have wanted, want, or will want to appeal MLTC's preenrollment initial personal care services authorizations given the opportunity to do so.

**Subclass C**: Individuals that would have wanted, want, or will want to appeal RiverSpring's preenrollment initial personal care service authorizations given the opportunity to do so.

She moves for certification under Rule 23(b)(2) and identifies three common legal questions.

(1) whether the members of the main class and subclasses have a property right in the amount of Medicaid-funded personal care services they were, are, or will be awarded by MTLC's;

(2) whether they have a right under the Due Process Clause of the Fourteenth Amendment to appeal the MLTCs' determinations of the amount of personal care services they have been awarded; and

(3) whether they have a Due Process right to receive notice of a right to appeal those determinations.

## DISCUSSION

I.    Article III Standing

Article III courts are courts of limited jurisdiction and may only

However, suits against state officers seeking prospective injunctive relief are authorized by the Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908); *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (in assessing *Ex Parte Young*'s exception, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (internal quotation marks omitted)); *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) ("A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers . . . provided that his complaint (a) alleges an ongoing violation of federal law and (b)

5

**AD-005**

seeks relief properly characterized as prospective." (internal quotation marks omitted)). *Kelly v. New York State Civ. Serv. Comm'n*, 632 Fed. App'x 17, 18 (2d Cir. 2016).

Defendants acknowledge that their standing arguments already have been addressed by me and the Second Circuit on appeal. *See Bellin*, 457 F. Supp. 3d at 418–20 (finding inherently transitory exception to mootness applicable); *Bellin*, 6 F.4th at 473–74 (same). They distinguish their prior arguments as going to mootness and contend that here they are challenging the Article III requirement of injury-in-fact. They claim that neither Plaintiff nor proposed class members have suffered a cognizable injury-in-fact redressable by this Court or, in some cases, no injury at all.

The violation of a constitutional right constitutes injury-in-fact. If Plaintiff is correct that there is a property right in the initial (pre-enrollment) determination of care hours, and further shows that the current administrative procedures offer inadequate protection, then New York's statutory scheme, enforced by Defendant State and executed by MLTCs like Defendant RiverSpring have violated MLTCs applicants' constitutional rights because they have not recognized, let alone protected, those rights. Defendants claim that the requested relief will not remedy Plaintiff's alleged injury because she is already receiving 24-hour care. Moreover, as to proposed class members, Defendants note that reassessments are required to be done once a year, so anyone whose initial application was more than one year ago would have effectively received a reevaluation and because they would already have been enrolled, if unsatisfied, would have a right to appeal.

Defendants' arguments are misdirected because Plaintiff claims a "due process gap" in the period between when an applicant enrolls with and receives care, at the level offered in the MLTC's initial pre-enrollment determination, and the date when the MLTC renders an

"initial" (postenrollment) determination where an applicant seeks additional hours.  She wants a declaration that her rights have been violated.

Defendants also claim that Plaintiff has never pressed for damages, and that even if she had, none would be available as barred by the Eleventh Amendment.  Here again Defendants miss the mark.  Plaintiff claims an ongoing interest in this litigation because, if the property right and appeal rights exist, then under state law, she may be able to recover the monies expended during the "due process gap" period.  However, Plaintiff does not seek damages in *this* lawsuit, nor does she seek to represent a class of individuals for that purpose. Plaintiff seeks two remedies.  First, a declaration that the claimed property right exists and has been (or will be) violated, absent a declaration from the Court.  Second, injunctive relief in the form of notice of the right to appeal and the processing of said appeal.  Contrary to Defendants' assertions, the Eleventh Amendment is not a barrier to my awarding either form of relief.

Defendants cite to *Edelman v. Jordan*, for the proposition that the Eleventh Amendment bars relief that has the effect of a retroactive award payable out of the state treasury, but the declaratory and injunctive relief will have no such effect.  This case is unlike *Edelman*, and in fact, analogous to *Quern v. Jordan*, where the Supreme Court held that requiring the state to provide notice of a right to appeal "f[ell] on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side."  440 U.S. 332, 347 (1979).  Although Plaintiff claims her continued interest in this suit stems from a possible recovery of the monies she expended in supplementing the inadequate number of care hours between the time of her enrollment and the date of RiverSpring's initial post-enrollment determination, neither a declaration that her rights were violated, nor a required sending of notice "amounts to a monetary award."  *Id.*  Rather, the notice would apprise Plaintiff of "the existence of whatever

**AD-007**

administrative procedures may already be available under state law by which they may receive a determination of eligibility for pass benefits." *Id.* at 347–48. Whether Plaintiff takes advantage of those administrative procedures lies solely within her discretion, and if she does, whether Plaintiff or any class member "receive[s] retroactive benefits rests entirely with the State, its agencies, courts, and legislature[.]" *Id.* at 348. The federal court plays no role in either decision.

Plaintiff has requested that I certify a class to address the questions about the existence of a property right, a right of appeal, and notice of that right. The declaratory and injunctive relief requested would remedy Plaintiff's injuries and are not barred by the Eleventh Amendment. *See Va. Office for Prot. & Advocacy*, 563 U.S. at 255; *Quern*, 440 U.S. at 347–49. In sum, Plaintiff has alleged an injury-in-fact fairly traceable to Defendants and redressable by the Court; accordingly, she has Article III standing.

II.     Class Certification

A.     Legal Standard

The class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). Fed. R. Civ. P. 23(a) permits a case to be litigated as a class action only upon a showing that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 18, 137 (2d Cir. 2015). "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Rule 23 does not set forth a mere pleading standard.").

AD-008

After showing that the Rule 23(a) requirements are satisfied, a party seeking class certification must show also that the claims within one of the three types of classes defined in Rule 23(b)—risk of inconsistent adjudications if prosecuted as separate actions, Fed. R. Civ. P. 23(b)(1); a request for declaratory or injunctive relief against a party that has acted or refused to act on grounds that apply generally to the class, Fed. R. Civ. P. 23(b)(2); or where the claims of potential class members share questions of law or fact that predominate over questions affecting any individual member, and the class action is a superior method for fair and efficient adjudication, Fed. R. Civ. P. 23(b)(3).

Finally, the Second Circuit has recognized an additional pre-condition to class certification: "the implied requirement of ascertainability." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413–14 (S.D.N.Y. 2015); *see also Brecher v. Rep. of Argentina*, 806 F.3d 22, 24–25 (2d Cir. 2015). For a class to be ascertainable, the definition must be based on "objective criteria," *Stinson v. City of New York*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012) (citation omitted), and "administratively feasible," such that members can be identified without conducting a "mini hearing on the merits of each case." *Charron v. Pinnacle Group N.Y. L.L.C.*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010).

B.     Analysis

The first step in deciding a motion to certify a class under Rule 23 is determining the correct class definition. *See Charrons*, 269 F.R.D. at 228; 5 Moore's Federal Practice § 23.21 [d] ("[C]ourts commonly examine whether a class is adequately defined before turning to the other requirements for class certification."). Plaintiff proposes one main class and three subclasses for certification. Defendants argue that all of Plaintiff's proposed classes are

AD-009

substantively overbroad and include individuals that suffered no injury or, due to the passage of time, would not benefit from the requested relief.

I find that the class should be defined as: "individuals who applied for personal care services with MLTC's and were not given an adequate level of hours." *See Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)) (recognizing the broad discretion of a district court judge in deciding whether to certify a class, including to carve out an appropriate class). Even under this more narrowly-tailored class definition, however, the class fails for want of ascertainability, and I decline to certify on this basis.

"A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24–25. An objective standard alone is not necessarily sufficient, however. *Id.* The criteria must readily identify those who will be bound (or benefitted) by the judgment.

Here, the class cannot be ascertained by reference to objective criteria. Class membership depends on whether the initial aware of care hours was "adequate." But adequacy is a subjective criterion that turns on an individual's perception of her need for care—that is, whether she *believed* that the initial hours awarded were inadequate. *See Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 44–45 (2d Cir. 2006) (citing *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ("Where membership in the class requires a subjective determination, the class is not identifiable.")). There is no objective independent basis for determining whether an award was adequate. This alone renders the class not ascertainable and is a sufficient basis for denying certification. *See*

*Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010) (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).

Moreover, even if individuals could self-identify as class members, by stating their dissatisfaction with their initial award of hours and desire to appeal, this would not render the class ascertainable. The class must be limited to individuals that suffered a due process violation that remediable by an order compelling such process be given. To prove a due process violation, an individual must show that the current procedures do not adequately protect the claimed property interest. A mere perception that an initial award of care hours was an inadequate does not establish a due process violation, however.

To ascertain the class, I would have to decide whether every proposed class member suffered a due process violation. For example, Plaintiff sought 24-hour care and was awarded eight hours. The absence of any immediate appeal right might prove critical to her, wherein no other procedures could be deemed adequate, and therefore, the absence of an immediate appeal right might be a due process violation as to Plaintiff. In contrast, imagine a man who was dissatisfied because he wanted twelve hours but was awarded only ten. While he may be forced to accept the lower hours under the current procedures, the effect may not be as devastating and, when considering the extra administrative expense associated with an immediate appeal that affords only minimal increased benefit, the current procedures may adequately protect his interest and constitute due process. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (balancing the interests at stake, including "the private interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal

AD-011

and administrative burdens that the additional or substitute procedural requirement would entail"). To ascertain the class, I would have to distinguish between individuals like Plaintiff and the man described above, requiring me to undertake the cumbersome process of inquiring into and conducting a mini-hearing on the merits of every potential class member's claim. Even assuming that it would be feasible and desirable to adopt such a procedure, these "kind of individualized mini-hearings . . . run contrary to the principle of ascertainability." *Brecher*, 806 F.3d at 26 (citations omitted).

In sum, I find that the class is not ascertainable because the potential class is defined based on subjective criteria and because identifying class members would require a mini-hearing on the merits of potential class member's claim. The motion for class certification is denied.

## CONCLUSION

For the reasons provided above, the motion for class certification is denied. The parties shall appear for a status conference, as scheduled, on October 21, 2022, at 10:00 a.m., to discuss how the case will proceed. In advance of the conference, the parties jointly shall submit an agenda and proposed schedule, noting any differences in view and stating the parties' respective positions.

The Clerk of Court shall terminate ECF No. 94.

SO ORDERED.

Dated:  September 30, 2022
        New York, New York      _____
                                ALVIN K. HELLERSTEIN
                                United States District Judge

**AD-012**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ROSALIND BELLIN,                                    :
                                                    :
                                    Plaintiff,      :     **ORDER AND OPINION ON**
                                                    :     **REMAND GRANTING**
            v.                                      :     **DEFENDANT'S MOTION FOR**
                                                    :     **SUMMARY JUDGMENT**
HOWARD ZUCKER, M.D., J.D. in his official           :
capacity as Commissioner, New York State            :     19 Civ. 5694 (AKH)
Department of Health and ELDERSERVE                 :
HEALTH, INC., d.b.a. RIVERSPRING AT HOME,           :
                                                    :
                                    Defendants.     :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The issue before me is whether an individual who is qualified to receive

Medicaid services in the form of long term home-care from a managed long-term care facility

and is offered fewer hours of Medicaid-paid home-care than those to which she believes she is

entitled, has been denied a property right, giving her the right to appeal administratively and

obtain a fair hearing of the facility's adverse determination.  I previously held that Bellin lacked

such a property right and could not appeal a pre-enrollment determination; her right of appeal

accrued upon a post-enrollment denial of sufficient hours of home-care.

        The Court of Appeals agreed that the Medicaid statutes did not confer such a right, but

remanded the case for me to consider if the Constitution provided that right, i.e., did she possess

a property right that was violated and a right to appeal under the Due Process Clause of the 14th

Amendment of the U.S. Constitution?  The Court of Appeals defined a constitutionally protected

property right as a right, under applicable statutes and regulations, to a particular benefit, created

where "'those statutes or regulations meaningfully channel official discretion by mandating a

1

**AD-013**

defined administrative outcome.'" *Bellin v. Zucker et al.*, 6 F.4th 463, 475 (2d Cir. 2021)

(quoting *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005)).

Upon remand, and following full discovery, both sides moved for summary judgment.[1]

## Background and Factual Record

Under New York law, individuals deemed eligible by New York State to receive long-term home care paid by Medicaid must enroll in a Managed Long Term Care Plan ("MLTC" or "MCO"). Eligible applicants may apply to as many institutions providing such long-term home care as they wish. The providers must evaluate each applicant and determine the number of hours of long-term care for which the applicants are eligible. The providers are paid a fixed, capitation fee for the applicants they enroll. Thus, they are given an incentive to enroll many applicants but, as plaintiff has argued, an incentive also to provide minimum hours of care. New York State adopted this regimen in 1997, in place of fees-for-services, to make Medicaid more efficient and less costly.

In April 2019, plaintiff applied to defendant ElderServe Health, Inc., DBA RiverSpring at Home ("RiverSpring") and to another institution, both providers of long-term home care. Each assessed her need as requiring eight hours of home-care, seven days a week. Bellin applied to RiverSpring on May 15, 2019, stating that her immobility and other limitations required 24/7 live-in care and asked to appeal RiverSpring's initial determination. RiverSpring told Bellin that she could not appeal until she was enrolled. On June 1, 2019, Bellin was enrolled and began to receive eight hours per day of home-care services, and again sought to appeal. RiverSpring responded that she could not appeal a pre-enrollment determination, but considered her appeal as a request for increased hours of live-in service. On June 15, 2019,

---

[1] Defendant Zucker also moved to strike plaintiff's Rule 56.1 counter-statement. Although the motion has merit, as plaintiff concedes, the motion is denied as moot. Its disposition will not contribute to any substantive or procedural relief.

**AD-014**

RiverSpring denied Bellin's request for additional service. Three days later, Bellin again asked for 24/7 service, stating that her condition had become worse and that she was now wheel-chair bound. Again, RiverSpring assessed Bellin, and this time it agreed that Bellin required 24/7 service and, beginning July 23, provided Bellin with 24/7 live-in home care. In the meantime, and since RiverSpring's initial determination in April, Bellin had supplemented the eight hours that RiverSpring provided to add an additional 16-hours per day, at her expense.

Bellin pressed her appeal for entitlement to 24/7 live-in service between June 1, the date of her enrollment, to July 23, 2019, the date such service was provided. An administrative "fair hearing" upheld her appeal and granted the retroactive authorization that Bellin had requested. On rehearing, however, a different administrative official limited retroactivity to July 18, 2019, holding that she was not entitled to appeal RiverSpring's initial determination, that RiverSpring properly considered her effort to appeal on June 4 as a request for additional home-care time, and that she was entitled to, even though she did not receive, a determination within 14 days of that request. July 18 was the fourteenth day after Bellin's request.

By this lawsuit, Bellin seeks recovery for her out-of-pocket expenses between June 1 and July 18, 2019 and, for the class she seeks to represent, similar monetary recoveries and a declaration of the right to an administrative appeal from an adverse initial determination of a Managed Long Term Care facility in which the class-member enrolls, and notice that they have such a right of appeal. Plaintiff claims that she, and the class, were denied due process of law guaranteed by the 14th Amendment to the U.S. Constitution and various federal statutes. She defines the class she seeks to represent as "current and future New York State Medicaid recipients who have applied or will apply for Medicaid-funded personal care services from MLTCs."

On September 30, 2022, I denied Bellin's motion for class certification. ECF No. 117. I held that the proper definition of the purported class was "individuals who applied for

AD-015

personal care services with MLTC's and were not given an adequate level of hours." *Id.* at 10. However, the adequacy of a care determination is a subjective inquiry based on an individual's perception of her own needs. And under Second Circuit precedent, a class must be ascertainable on the basis of objective criteria. *See Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003). So, because membership of the class was contingent upon the subjective inquiry of adequacy of care, the class was not ascertainable, and the motion for class certification could not be granted.

### Standard of Review

Under Federal Rule of Civil Procedure 56(a), to succeed on a motion for summary judgment, the movant must show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court must view all facts in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### Discussion

To prevail on a procedural due process claim, a plaintiff must show that she was deprived of a constitutionally protected property or liberty interest. *Narumanchi v. Board of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988). In the context of access to Medicaid-funded care, this property right arises where "[the] statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome." *Kapps*, 404 F.3d at 113. Courts have additionally looked to informal practices or policies when determining whether official discretion has been meaningfully channeled. *Furlong v. Shalala*, 156 F.3d 384, 395 (2d Cir. 1998). As outlined in the Second Circuit's opinion in this case, such an inquiry involves two facets of discretion: first, the discretion of an authority to grant or deny a benefit; and second, the extent to which enumerated criteria cabin an authority's decision-making power. *Bellin v. Zucker*, 6 F.4th 463, 476 (2d Cir. 2021). Put another way, this second form of discretion asks

4

AD-016

whether the prescribed criteria are open-ended and subjective, or certain and inflexible. *Id.* Any

inquiry into the discretion of a decision-maker therefore requires close examination of the

underlying decision-making process.

New York law provides for in-home personal care services under Medicare. *See* N.Y.

Soc. Servs. L. § 440.167. It defines these services as "some or total assistance with personal

hygiene; dressing and feeding; nutritional and environmental support functions; and health-

related tasks." N.Y.C.R.R § 505.14. If a New York resident believes she is eligible for this care,

she must undergo an assessment ("CHA") in which an independent nurse assessor holistically

examines a potential enrollee's circumstances to determine if and how much care is needed.

N.Y.C.R.R. § 505.14(b)(2). Assessors may also, but are not required to, use task-based

assessment tools for potential enrollees other than those seeking twenty-four-hour care.

N.Y.C.R.R. at § 505.14(d). The CHA helps the assessor collect all relevant information by

asking a comprehensive set of questions; by facilitating conversations with the potential

enrollee's family or caretakers; and by utilizing the nurse's observations of the potential enrollee

as well as the space in which she lives. CHA Reference Manual at DOH 0001525-26. While the

CHA prompts these inputs from assessors, it does not generate any automatic plan of care or

serve as a strict formula by which care hours are determined. Instead, the nurse assessor puts all

the pieces together into a care plan, which combines the potential enrollee's individualized goals,

clinical and support needs, informal services, the type and amount of services to be delivered, the

provider of those services, timeframes for completing those services, a back-up plan when for

when typical services are unavailable; the setting in which the enrollee resides, and measures to

minimize risk factors. 42 C.F.R. § 441.301(c)(2); PCSP Guidelines at DOH 0001728-29; DOH

Plan of Care Template at DOH 0002131-39.

**AD-017**

While this statutory and regulatory process guides assessors in obtaining inputs, the decision of what and how much care to provide to an enrollee is shaped by a nurse assessor's clinical judgment. ECF No. 134, Ex. G (McNall Dep. 41:6-42:11; 86:2-88:13). There is not a mandated administrative outcome, as defined by the Second Circuit, giving rise to a property right. Instead, much of the care plan is developed using the assessor's discretion, as shown through the requirements that the nurse assessor must come to a care conclusion on the basis of not only the answers to prescribed questions, but also what she sees, the discussions she has with family, care providers, and the potential enrollee, and how she evaluates all of this information holistically.

*Barrows v. Becerra*, to which plaintiff cites, is distinguishable from the instant case. 24 F.4th 116 (2d Cir. 2021). That case involved a "Two-Midnight" Rule, which determined whether a patient was entitled to a bed in the hospital, covered by Medicare Part A, or could be treated as an out-patient. Plaintiff, and the class members he wished to represent, sued Xavier Becerra, the Secretary of the Department of Health and Human Services (HHS), alleging that even though their care overlapped two midnights, they were subsequently reclassified as out-patient status and were not given an administrative review process to challenge this reclassification. The district court ruled in favor of the plaintiff, and the Court of Appeals affirmed. The Two-Midnight Rule was an objective standard. Thus, the plaintiff qualified for Medicare Part A in-hospital coverage. The Court of Appeals held that the benefits regime meaningfully channeled official discretion because it mandated a patient's status based on length and quality of their hospital stay alone. *Id.* at 139-40. One simple input—whether or not a patient had to spend two nights at the hospital—was determinative whether that patient received Medicare coverage. Here, in contrast, the community health assessment gathers many inputs, all

**AD-018**

filtered through the nurse assessor's perspective, and instructs the nurse assessor to put her

observations into a care plan based on what she sees, hears, and learns about a patient's needs.

N.Y. P.H.L. § 4403-f(7)(h)(i); ECF No. 146, Ex. L (Konrad Dep. at 160:8-161:11). This

procedure, unlike the Two-Midnights Rule, requires subjective evaluation with no predictable

result, other than outliers who clearly do, or do not, require twenty-four-hour care.

    Plaintiff argues that when twenty-four-hour care is required, the relevant statutes and

regulations are more stringent, meaningfully channeling the nurse assessors' discretion. ECF

No. 149 at 35-36. For example, task based-assessment tools are not permitted in cases of

twenty-four-hour care. *See* MLTC Policy 16.07 Guidance on Task-based Assessment Tools for

Personal Care Services and Consumer Directed Personal Assistance Services. Moreover, if a

live-in aide cannot get more than five hours of sleep while caring for an enrollee, then New York

law requires provision of two aides working consecutive twelve-hour shifts. N.Y.C.R.R. §

505.14(a)(2-4). However, as plaintiff's brief concedes, these rules come into force only *after* a

nurse assessor has first determined that twenty-four-hour care is required. Enrollees first must be

evaluated as to whether or not they require 24/7 care, and that evaluation requires the subjective,

holistic process of the CHA. *See* ECF No. 161 at 16-17 ("When the assessment makes clear that

the applicant needs some form of twenty-four-hour care . . . the agencies must discard any

reference to a task-based tool . . ."). It was only after plaintiff became wheelchair bound, after

she was already enrolled in RiverSpring, that she was evaluated as requiring twenty-four-hour

care. Only following this twenty-four-hour finding did task-based assessments become

irrelevant.

    Plaintiff next argues from an alleged practice derived from reported fair hearing decisions

which reversed initial pre-enrollment rulings as to the number of care hours to which enrollees

**AD-019**

might be eligible. Plaintiff argues that because these decisions rely on a similar set of criteria, there is a consistent practice indicating a property right. ECF No. 149 at 38-39. Plaintiff fails to note, however, that these decisions are fact-intensive—for example, the first fair hearing decision plaintiff references reviewed the enrollee's toileting habits; walking capabilities; various diagnoses of hypertension, glaucoma, polyarthritis, and seizures; the enrollee's sister's testimony; her ability to take her medication; her dressing habits; her cognitive function; and her locomotion, among other factors, before coming to a twenty-four-hour care assessment. ECF No. 164, Ex. 22, link one (fair hearing decision # 7448221H). In another fair hearing decision cited by plaintiff, the enrollee's observable, physical difficulties; doctor's statements; family situation; hospital records; daughter's physical abilities and own medical issues; and the enrollee's home layout were all considered before his care hours were increased to constant care. ECF No. 164, Ex. 22, link two (fair hearing decision #7491462H). Further, plaintiff fails to note the hundreds of fair hearing decisions that *affirmed* a nurse assessor's eligibility determination of fewer hours of daily care for which an enrollee might be eligible. There is no consistent pattern which points to the existence of a property right.

The CHA process, and the nurse assessors who carry it out, require subjective evaluations. Questions to an enrollee might be prescribed, but these do not lead to a predictive determination. This process does not meaningfully channel the discretion of the nurse assessors, but rather requires their clinical judgment and discretion. It therefore cannot be said that Bellin had a property right before enrolling in RiverSpring. And without a property right, she had no entitlement to the protections of the Due Process Clause. Bellin was not deprived of due process when her effort to appeal a pre-enrollment decision was rejected. Defendants' motions for summary judgment are granted, and plaintiff's is denied.

8

**AD-020**

The Clerk of Court shall terminate ECF No. 131, 139, 140, 147, and 173, and enter

judgment dismissing the Complaint and tax costs.

        SO ORDERED.

Dated:      February 1, 2024
            New York, New York

                               ALVIN K. HELLERSTEIN
                             United States District Judge

AD-021

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROSALIND BELLIN,

                        Plaintiff,

          -against-

HOWARD ZUCKER, M.D., J.D. in his official capacity as
Commissioner, New York State Department of Health and
ELDERSERVE HEALTH, INC., d.b.a. RIVERSPRING
AT HOME,

                      Defendants.
-------------------------------------------------------------------X

19 **CIVIL** 5694 (AKH)

# <u>JUDGMENT</u>

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Order dated February 1, 2024, Defendants' motions for summary judgment

are granted and plaintiff's is denied.  Judgment is entered dismissing the complaint.

**Dated:**  New York, New York

       February 1, 2024

                                    **RUBY J. KRAJICK**
                              _____
                                   **Clerk of Court**

               **BY:**      *K. Mango*
                                _____
                                   **Deputy Clerk**

**AD-022**

UNITED STATES CONSTITUTION, AMENDMENT XIV

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**42 U.S.C. § 1983**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Title 18: Section 505.14 - Personal care services[1]**

**Effective Date**

11/08/2021

**505.14 Personal care services.**

**(a) Definitions and scope of services.**

(1) Personal care services means assistance with nutritional and environmental support functions and personal care functions, as specified in clauses (5)(i)(a) and (5)(ii)(a) of this subdivision. Such services must be medically necessary for maintaining an individual's health and safety in his or her own home, as determined by the social services district or Medicaid managed care organization in accordance with this section; ordered by a qualified independent practitioner; based on an assessment of the individual's needs and of the appropriateness and cost-effectiveness of services specified in subparagraph (b)(2)(iii) of this section; provided by a qualified person in accordance with a plan of care; and supervised by a registered professional nurse.

(2) Continuous personal care services means the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24-hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(3) Personal care services, as defined in this section, can be provided only if the individual meets applicable minimum needs requirements described in subparagraph (iv) of this paragraph, and the social services district or Medicaid managed care organization reasonably expects that the individual's health and safety in the home can be maintained by the provision of such services, as determined in accordance with this section.

---

[1] This listing includes only the two relevant subsections (a) and (b) regarding authorization and approval criteria and definitions.

**AD-025**

(i) The patient's medical condition shall be stable, which shall be defined as follows:

(*a*) the condition is not expected to exhibit sudden deterioration or improvement; and

(*b*) the condition does not require frequent medical or nursing judgment to determine changes in the patient's plan of care; and

(*c*)

(*1*) the condition is such that a physically disabled individual is in need of routine supportive assistance and does not need skilled professional care in the home; or

(*2*) the condition is such that a physically disabled or frail elderly individual does not need professional care but does require assistance in the home to prevent a health or safety crisis from developing.

(ii) The patient shall be self-directing, which shall mean that he/she is capable of making choices about his/her activities of daily living, understanding the impact of the choice and assuming responsibility for the results of the choice. Patients who are nonself-directing, and who require continuous supervision and direction for making choices about activities of daily living shall not receive personal care services, except under the following conditions:

(*a*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual living within the same household; or

(*b*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual not living within the same household; or

(*c*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by an

outside agency or other formal organization. The local social services department may be the outside agency.

(iii) Personal care services, including continuous personal care services and live-in 24-hour personal care services, shall not be authorized to the extent that the social services district or Medicaid managed care organization determines that any of the services or supports identified in subclauses (11) through (13) of subdivision (b)(2)(iii)(a) of this section are available and appropriate to meet the individual's needs and are cost-effective if provided instead of personal care services.

(iv) Individuals must meet minimum needs requirements in accordance with state statute to be eligible for personal care services. For purposes of this section, minimum needs requirements means:

(*a*) for individuals with a diagnosis by a physician of dementia or Alzheimer's, being assessed in accordance with subdivision (b) of this section as needing at least supervision with more than one activity of daily living.

(*b*) for all other individuals, being assessed in accordance with subdivision (b) of this section as needing at least limited assistance with physical maneuvering with more than two activities of daily living.

(4) Live-in 24-hour personal care services means the provision of care by one personal care aide for a patient who, because of the patient's medical condition, needs assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding and whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(5) Personal care services shall include the following two levels of care, and be provided in accordance with the following standards:

(i) Level I shall be limited to the performance of nutritional and environmental support functions.

(*a*) Nutritional and environmental support functions include assistance with the following:

(*1*) making and changing beds;

(*2*) dusting and vacuuming the rooms which the patient uses;

(*3*) light cleaning of the kitchen, bedroom and bathroom;

(*4*) dishwashing;

(*5*) listing needed supplies;

(*6*) shopping for the patient if no other arrangements are possible;

(*7*) patient's laundering, including necessary ironing and mending;

(*8*) payment of bills and other essential errands; and

(*9*) preparing meals, including simple modified diets.

(*b*) The authorization for Level I services shall not exceed eight hours per week.

(ii) Level II shall include the performance of nutritional and environmental support functions specified in clause (i)(a) of this paragraph and personal care functions.

(*a*) Personal care functions include assistance with the following:

(*1*) bathing of the patient in the bed, the tub or in the shower;

(*2*) dressing;

(*3*) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth;

(*4*) toileting; this may include assisting the patient on and off the bedpan, commode or toilet;

**AD-028**

(*5*) walking, beyond that provided by durable medical equipment, within the home and outside the home;

(*6*) transferring from bed to chair or wheelchair;

(*7*) turning and positioning;

(*8*) preparing of meals in accordance with modified diets, including low sugar, low fat, low salt and low residue diets;

(*9*) feeding;

(*10*) administration of medication by the patient, including prompting the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly;

(*11*) providing routine skin care;

(*12*) using medical supplies and equipment such as walkers and wheelchairs; and

(*13*) changing of simple dressings.

(*b*) Before more than 12 hours of personal care services per day on average, including continuous personal care services or live-in 24-hour personal care services, may be authorized, additional requirements for the authorization of such services, as specified in subdivision (b)(2)(v) of this section, must be satisfied.

(*iii*) The personal care aide may perform nutritional and environmental support functions and personal care functions for the recipient and may also assist the recipient to perform such tasks themselves. Assistance may include supervision and cueing to help the recipient perform a nutritional and environmental support function or personal care function if the recipient could not perform the task

without such assistance. Supervision and cueing are not standalone personal care services and may not be authorized, paid for or reimbursed except for providing assistance with nutritional and environmental support functions or personal care functions.

(6) Shared aide means a method of providing personal care services under which a social services district authorizes one or more nutritional and environmental support functions or personal care functions for each personal care services recipient who resides with other personal care services recipients in a designated geographic area, such as in the same apartment building, and a personal care services provider completes the authorized functions by making short visits to each such recipient.

(7) Medicaid managed care organization or MMCO means an entity, other than an entity approved to operate a Program of All-inclusive Care for the Elderly (PACE) plan, that is approved to provide medical assistance services, pursuant to a contract between the entity and the Department of Health, and that is: (i) certified under article forty-four of the Public Health Law, or (ii) licensed under article forty-three of the Insurance Law.

(8) Medical assistance or Medicaid or MA means the program to provide services and benefits under title 11 or article 5 of the Social Services Law.

(9) Activities of daily living means those activities recognized as activities of daily living by the evidence based validated assessment tool in accordance with section 2-a of part MM of chapter 56 of the laws of 2020.

(10) For the purposes of this section individual and patient are used interchangeably, except as otherwise dictated by context.


**(b) Criteria for the assessment and authorization of services**.

(1) The assessment process includes an independent assessment, a medical examination and practitioner order, an evaluation of the need and cost-effectiveness of services, the development of the plan of care, and, when required under paragraph (2) of this subdivision, a referral for an independent review. The independent assessment, medical examination and independent review panel may utilize telehealth modalities for all or a portion of such assessments provided that the individual is given an opportunity for an in-person assessment and receives any

necessary support during the telehealth assessment, which may include the participation of an on-site representative or support-staff.

(2) The initial assessment process shall include the following procedures:

(i) Independent assessment. An assessment shall be completed by an independent assessor employed or contracted by an entity designated by the Department of Health to provide independent assessment services on forms approved by the Department of Health in accordance with the following:

(*a*) The independent assessment must be performed by a nurse with the following minimum qualifications:

(*1*) a license and current registration to practice as a registered professional nurse in New York State; and

(*2*) at least two years of satisfactory recent experience in home health care.

(*b*) The independent assessment shall include the following:

(*1*) an assessment of the functions and tasks required by the individual, including an assessment of whether the individual meets minimum needs requirements;

(*2*) a discussion with the individual to determine perception of his/her circumstances and preferences; and

(*3*) an assessment of the potential contribution of informal caregivers, such as family and friends, to the individual's care, and shall consider all of the following:

(*i*) number and kind of informal caregivers available to the individual;

(*ii*) ability and motivation of informal caregivers to assist in care;

(*iii*) extent of informal caregivers' potential involvement;

(*iv*) availability of informal caregivers for future assistance; and

(*v*) acceptability to the individual of the informal caregivers' involvement in his/her care.

(*c*) The independent assessment must assess the individual where the individual is located including the individual's home, a nursing facility, rehabilitation facility or hospital, provided that the individual's home or residence shall be evaluated as well if necessary to support the proposed plan of care and authorization or to ensure a safe discharge. This provision shall not be construed to prevent or limit the use of telehealth in the assessment of an individual.

(ii) Independent medical examination and practitioner order.

(*a*) Each individual seeking personal care services must have an examination by a medical professional employed or contracted by an entity designated by the Department of Health to provide independent practitioner services.

(*b*) The medical professional who examines the individual must be a physician licensed in accordance with article 131 of the Education Law, a physician assistant or a specialist assistant registered in accordance with article 131-B of the Education Law, or a nurse practitioner certified in accordance with article 139 of the Education Law.

(*c*) The medical professional must be independent with respect to the individual, meaning that medical professional that conducts the exam must not have established a provider-patient relationship with the individual prior to the clinical encounter from which the practitioner order is completed.

(*d*) The medical professional must examine the individual and accurately describe the individual's medical condition and regimens, including any medication regimens and the individual's need for assistance with personal care services tasks.

(*e*) The medical professional must review the independent assessment and may review other medical records and consult with the individual's providers and others involved with the individual's care if available to and determined necessary by the medical professional.

**AD-032**

(*f*) The medical professional must complete a form required or approved by the Department of Health (the "practitioner order form").

(*g*) The medical professional must sign the practitioner order form, certify that the information provided in the form accurately describes the individual's medical condition and regimens at the time of the medical examination, and indicate whether the individual is self-directing and whether the individual is medically stable.

(*h*) The practitioner order form must be completed and made available by the medical professional to the social services district or any MMCOs as appropriate after the medical examination and independent assessment.

(*i*) The practitioner order is subject to the provisions of Parts 515, 516, 517 and 518 of this title. These Parts permit the Department of Health or other agencies or organizations duly authorized or delegated by the Department of Health, including but not limited to MMCOs or the Office of the Medicaid Inspector General, to impose monetary penalties on, or sanction and recover overpayments from, providers or prescribers of medical care, services, or supplies when medical care, services, or supplies that are unnecessary, improper or exceed individuals' documented medical needs are provided or ordered.

(iii) Social services district or MMCO responsibilities.

(*a*) Before developing a plan of care or authorizing personal care services, a social services district or MMCO shall review the individual's most recent independent assessment and practitioner order, and may directly evaluate the individual, to determine the following:

(*1*) whether personal care services can be provided according to a plan of care, whether such services are medically necessary and whether the social services district or MMCO reasonably expects that such services can maintain the individual's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health;

(*2*) the frequency with which nursing supervision would be required to support services if authorized;

(*3*) the individual's preferences and social and cultural considerations for the receipt of care;

(*4*) whether the individual can be served appropriately and more cost-effectively by personal care services provided under a consumer directed personal assistance program authorized in accordance with Section 365-f of the Social Services Law;

(*5*) whether the functional needs, living arrangements and working arrangements of an individual who receives personal care services solely for monitoring the individual's medical condition and well-being can be monitored appropriately and more cost-effectively by personal emergency response services provided in accordance with section 505.33 of this Part;

(*6*) whether the functional needs, living arrangements and working arrangements of the individual can be maintained appropriately and more cost-effectively by personal care services provided by shared aides in accordance with subdivision (k) of this section;

(*7*) whether an individual who requires, as a part of a routine plan of care, part-time or intermittent nursing or other therapeutic services or nursing services provided to a medically stable individual, can be served appropriately and more cost-effectively through the provision of home health services in accordance with section 505.23 of this Part;

(*8*) whether the individual can be served appropriately and more cost-effectively by other long-term care services and supports, including, but not limited to, the assisted living program or the enriched housing program;

(*9*) whether personal care services can be provided appropriately and more cost-effectively by the personal care services provider in cooperation with an adult day health or social adult day care program;

(*10*) whether the individual's needs can be met through the use of telehealth services that can be demonstrated and documented to

reduce the amount of services needed and where such services are readily available and can be reliably accessed;

(*11*) whether the individual can be served appropriately and more cost-effectively by using adaptive or specialized medical equipment or supplies covered by the MA program including, but not limited to, bedside commodes, urinals, walkers, wheelchairs and insulin pens;

(*12*) whether the individual's needs can by met through the provision of formal services provided or funded by an entity, agency or program other than the medical assistance program; and

(*13*) whether the individual's needs can be met through the voluntary assistance available from informal caregivers including, but not limited to, the individual's family, friends or other responsible adult, and whether such assistance is available.

(*b*) The social services district or MMCO must first determine whether the individual, because of the individual's medical condition, would be otherwise eligible for personal care services, including continuous personal care services or live-in 24-hour personal care services. For individuals who would be otherwise eligible for personal care services, the social services district must then determine whether, and the extent to which, the individual can be served through the provision of services described in clauses (a)(4) through (a)(13) of this subparagraph.

(*1*) If a social services district or MMCO determines that an individual can be served appropriately and more cost-effectively through the provision of services described in clauses (a)(4) through (a)(10) of this subparagraph, and the social services district or MMCO determines that such services are available in the district, the social services district or MMCO must consider the use of such services in accordance with department guidance as well as the individual's identified preferences and social and cultural considerations described in clause (a)(3) of this subparagraph in developing the individual's plan of care.

(*2*) If a social services district or MMCO determines that other formal services are available or the individual's needs can be met using available adaptive or specialized medical equipment or supplies

or voluntary assistance from informal caregivers, as described in clauses (a)(11) through (a)(13) of this subparagraph, the social services district or MMCO must include these in the individual's plan of care. To ensure availability of voluntary informal supports, the social services district or MMCO must confirm the caregiver's willingness to meet the identified needs in the plan of care for which they will provide assistance.

(*c*) For cases involving live-in 24-hour personal care services, the social services district or MMCO shall evaluate whether the individual's home has sleeping accommodations for a personal care aide. When the individual's home has no sleeping accommodations for a personal care aide, continuous personal care services must be authorized for the individual; however, should the individual's circumstances change and sleeping accommodations for a personal care aide become available in the individual's home, the district or MMCO must promptly review the case. If a reduction of the individual's continuous personal care services to live-in 24-hour personal care services is appropriate, the district or MMCO must send the individual a timely and adequate notice of the proposed reduction.

(*d*) For cases involving continuous personal care services or live-in 24-hour personal care services, the social services district or MMCO shall assess and document in the plan of care the following:

(*1*) whether the practitioner order indicated a medical condition that causes the individual to need frequent assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding;

(*2*) the specific personal care functions with which the individual needs frequent assistance during a calendar day;

(*3*) the frequency at which the individual needs assistance with these personal care functions during a calendar day;

(*4*) whether the individual needs similar assistance with these personal care functions during the individual's waking and sleeping hours and, if not, why not; and

(*5*) whether, were live-in 24-hour personal care services to be authorized, the personal care aide would be likely to obtain, on a

**AD-036**

regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(*e*) The social services district or MMCO is responsible for developing a plan of care in collaboration with the individual or, if applicable, the individual's representative that reflects the assessments and practitioner order described in this paragraph. In the plan of care, the social services district or MMCO must identify:

(*1*) the personal care service functions or tasks with which the individual needs assistance;

(*2*) the amount, frequency and duration of services to be authorized to meet these needs;

(*3*) how needs are met, if not met through the authorization of services; and

(*4*) any other descriptions and documentation provided for in this section.

(*f*) Upon the development of a plan of care, the social services district or MMCO shall refer high needs cases described in subparagraph (v) of this paragraph to the independent review panel; provided, however, that an MMCO should not refer a case unless and until the individual is enrolled or scheduled for enrollment in the MMCO. When a case is referred to the independent review panel:

(*1*) the social services district or MMCO shall provide the individual's plan of care and any clinical records or other documentation used to develop the plan of care, such as records from treating providers and the results of any review or evaluation performed pursuant to this paragraph to the panel;

(*2*) the social services district or MMCO shall cooperate with the panel as appropriate to ensure an expedient review of each high needs case; and

(*3*) the social services district or MMCO shall consider the panel's recommendation in finalizing the plan of care and authorization. However, the social services district or MMCO is not

required to adopt the recommendation, either in full or in part, and retains responsibility for determining the amount and type of services medically necessary.

(iv) Coordinating the independent assessment, practitioner order and LDSS or MMCO responsibilities.

(*a*) The social services district or MMCO must coordinate with the entity or entities providing independent assessment and practitioner services to minimize the disruption to the individual and in-home visits.

(*b*) The social services district or MMCO must inform the entity or entities providing independent assessment and practitioner services when a new assessment or practitioner order is needed pursuant paragraphs (4)(xii) and (4)(xiii) of this subdivision, in accordance with department guidance, using forms as may be required by the department.

(*1*) When the social services district or MMCO receives an initial or new request for services it shall refer the individual to the entity providing independent assessment services and provide assistance to the individual in making contact in accordance with department guidance; provided however that the social services district or MMCO may not pressure or induce the individual to request an assessment unwillingly.

(*2*) If needed, the MMCO shall also refer the individual to the social services district to determine the individual's eligibility for medical assistance, including community based long term care services.

(*c*) The entity or entities providing independent assessment or practitioner services may request that the social services district or MMCO confirm or update an individual's record in the assessment database designated by the Department. The social services district or MMCO shall respond within one business day and confirm or update the relevant record within three business days after receipt of request.

(*d*) Resolving mistakes and clinical disagreements in the assessment process.

**AD-038**

(*1*) If the social services district or MMCO identifies a material mistake in the independent assessment that can be confirmed by the submission of evidence, the social services district or MMCO shall advise the independent assessor. A mistake is an error of fact or observation that occurred when the assessment was performed that is not subject to the assessor's clinical judgment. A mistake is material when it would affect the amount, type, or duration of services authorized. When identifying the mistake, the social services district or MMCO must provide evidence of the mistake to the independent assessor. The independent assessor shall promptly issue a corrected assessment or schedule a new assessment in accordance with subclause (3) of this clause as appropriate.

(*2*) After reviewing the independent assessment, practitioner order and the result of any social service district or MMCO assessment or evaluation, if the social services district or MMCO has a material disagreement regarding the outcome of the independent assessment, the social services district or MMCO may advise the independent assessor. A disagreement occurs when the social services district or MMCO disputes a finding or conclusion in the independent assessment that is subject to the independent assessor's clinical judgment. A disagreement is material when it would affect the amount, type, or duration of services authorized. When submitting a disagreement to the independent assessor, the social services district or MMCO must provide the clinical rationale that forms the basis for the disagreement.

(*3*) Upon submission of a material disagreement, an independent assessor shall schedule and complete a new assessment within 10 days from the date it receives notice from the social services district or MMCO. This shall not pend or otherwise affect the timeframes within which the social services district or MMCO is required to make a determination, provide notice, or authorize services.

(*e*) Sanctions for failure to cooperate and abuse of the resolution process.

(*1*) The Department of Health may impose monetary penalties pursuant to Public Health Law section 12 for failure to coordinate

with the entity or entities providing independent assessment and practitioner services in accordance with the provisions of clauses (*a*) through (*c*) of this subparagraph or engaging in abusive behavior that affects the coordination of the assessment process. In determining whether to impose a monetary penalty and the amount imposed, the Department shall consider, where applicable, the following:

> (*i*) The frequency and numerosity of violations, both in absolute terms and relative to other MMCOs;

> (*ii*) The responsiveness of the MMCO to requests for coordination;

> (*iii*) The history of coordination between the MMCO and the entity or entities;

> (*iv*) The good faith demonstrated by the MMCO in attempting to coordinate;

> (*v*) Whether the MMCO provides a justification for the violation and whether it has merit, as determined by the Department;

> (*vi*) Whether the violation resulted or could have resulted in injury or other harm to the individual; and

> (*vii*) Other relevant facts or circumstances.

(*2*) The Department of Health may revoke, or impose other restrictions on, a social services district's or MMCO's privilege to request reassessments on the basis of a material disagreement where the Department determines that the social services district has abused this privilege, including the use of mistake process for issues subject to clinical judgment or pressuring or inducing individuals to request a new assessment. In determining whether a social services district or MMCO has abused this privilege, the Department shall consider, where applicable, the following:

> (*i*) The frequency and numerosity of disagreements, mistakes, and reassessment requests submitted to the

independent assessor, both in absolute terms and relative to other social services districts and MMCOs;

(*ii*) Whether the clinical rationale provided for the disagreement has merit, as determined by the Department;

(*iii*) Whether the disagreement, mistake, and reassessment requests are made as a matter of course, instead of upon review of the clinical record;

(*iv*) The outcome of the reassessment as compared to the assessment it replaces; and

(*v*) Other facts or circumstances that tend to provide evidence for or against abuse.

(*3*) Nothing in this section shall be construed to limit the authority of the Department or other agencies to seek other remedies, sanctions or penalties, including other monetary penalties.

(v) Independent medical review of high needs cases.

An independent medical review of a proposed plan of care shall be obtained before a social services district or MMCO may authorize more than 12 hours of personal care services or consumer directed personal assistance separately or in combination per day on average, except as otherwise provided in paragraph (4) of this subdivision ("high needs cases"). The review shall result in a recommendation made to the social services district or MMCO, as described in this subparagraph.

(*a*) The independent medical review must be performed by an independent panel of medical professionals, or other clinicians, employed by or under contract with an entity designated by the Department of Health (the "independent review panel") and shall be coordinated by a physician (the "lead physician") who shall be selected from the independent review panel. The lead physician may not be the same person who performed the initial medical examination and signed the individual's practitioner order.

(*b*) The lead physician must review the independent assessment, the practitioner order, any other assessment or review conducted by the social services district or MMCO, including any plan of care created.

(*c*) The lead physician may evaluate the individual, or review an evaluation performed by another medical professional on the independent review panel. The medical professional may not have performed the initial medical examination or signed the individual's practitioner order.

(*d*) The lead physician and panel members may consult with or interview other members of the independent review panel, the ordering practitioner, the individual's treating or primary care physician, and other individuals who the lead physician deems important and who are available to assist the panel's review and recommendation.

(*e*) The lead physician and panel members may request additional information or documentation, including medical records, case notes, and any other material the lead physician deems important to assist the panel's review and recommendation.

(*f*) After review, the independent review panel shall produce a report, signed by the lead physician, providing a recommendation on the reasonableness and appropriateness of the proposed plan of care to maintain the individual's health and safety in his or her own home, in accordance with the standards and scope of services set forth in this section. The report may suggest modifications to the plan of care, including the level, frequency, and duration of services and whether additional, alternative, or fewer services would facilitate the provision of medically necessary care. The report may not, however, recommend a specific amount or change in amount of services.

18 NYCRR 505.14 (2016)

Section 505.14. Personal care services

**(a) Definitions and scope of services**.

(1) Personal care services means assistance with nutritional and environmental support functions and personal care functions, as specified in clauses (5)(i)(a) and (ii)(a) of this subdivision. Such services must be essential to the maintenance of the patient's health and safety in his or her own home, as determined by the social services district in accordance with this section; ordered by the attending physician; based on an assessment of the patient's needs and of the appropriateness and cost-effectiveness of services specified in subparagraph (b)(3)(iv) of this section; provided by a qualified person in accordance with a plan of care; and supervised by a registered professional nurse.

(2) Continuous personal care services means the provision of uninterrupted care, by more than one personal care aide, for more than 16 hours in a calendar day for a patient who, because of the patient's medical condition, needs assistance during such calendar day with toileting, walking, transferring, turning and positioning, or feeding and needs assistance with such frequency that a live-in 24-hour personal care aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(3) Personal care services, as defined in this section, can be provided only if the services are medically necessary and the social services district reasonably expects that the patient's health and safety in the home can be maintained by the provision of such services, as determined in accordance with this section.

AD-043

(i) The patient's medical condition shall be stable, which shall be defined as follows:

(*a*) the condition is not expected to exhibit sudden deterioration or improvement; and

(*b*) the condition does not require frequent medical or nursing judgment to determine changes in the patient's plan of care; and

(c) c)

(*1*) the condition is such that a physically disabled individual is in need of routine supportive assistance and does not need skilled professional care in the home; or

(*2*) the condition is such that a physically disabled or frail elderly individual does not need professional care but does require assistance in the home to prevent a health or safety crisis from developing.

(ii) The patient shall be self-directing, which shall mean that he/she is capable of making choices about his/her activities of daily living, understanding the impact of the choice and assuming responsibility for the results of the choice. Patients who are nonself-directing, and who require continuous supervision and direction for making choices about activities of daily living shall not receive personal care services, except under the following conditions:

(*a*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual living within the same household; or

(*b*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual not living within the same household; or

(*c*) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by an

outside agency or other formal organization. The local social services department may be the outside agency.

(iii)

(*a*) Personal care services, including continuous personal care services and live-in 24 hour personal care services as defined in paragraphs (2) and (4), respectively, of this subdivision, shall not be authorized to the extent that the patient's need for assistance can be met by the following:

(*1*) voluntary assistance available from informal caregivers including, but not limited to, the patient's family, friends, or other responsible adult;

(*2*) formal services provided or funded by an entity, agency or program other than the medical assistance program; or

(*3*) adaptive or specialized equipment or supplies including, but not limited to, bedside commodes, urinals, walkers, and wheelchairs, when such equipment or supplies can be provided safely and cost-effectively.

(*b*) The social services district must first determine whether the patient, because of the patient's medical condition, would be otherwise eligible for personal care services, including continuous personal care services or live-in 24-hour personal care services. For patients who would be otherwise eligible for personal care services, the district must then determine whether, and the extent to which, the patient's need for assistance can be met by voluntary assistance from informal caregivers, by formal services, or by adaptive or specialized equipment or supplies, as specified in subclauses (a)(1) through (a)(3) of this subparagraph.

(4) **Live-in 24-hour personal care services** means the provision of care by one personal care aide for a patient who, because of the patient's medical condition, needs assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding and whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular

basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(5) Personal care services shall include the following two levels of care, and be provided in accordance with the following standards:

(i) Level I shall be limited to the performance of nutritional and environmental support functions.

(*a*) Nutritional and environmental support functions include assistance with the following:

(*1*) making and changing beds;

(*2*) dusting and vacuuming the rooms which the patient uses;

(*3*) light cleaning of the kitchen, bedroom and bathroom;

(*4*) dishwashing;

(*5*) listing needed supplies;

(*6*) shopping for the patient if no other arrangements are possible;

(*7*) patient's laundering, including necessary ironing and mending;

(*8*) payment of bills and other essential errands; and

(*9*) preparing meals, including simple modified diets.

(b) The authorization for Level I services shall not exceed eight hours per week.

(ii) Level II shall include the performance of nutritional and environmental support functions specified in clause (i)(a) of this paragraph and personal care functions.

(*a*) Personal care functions include assistance with the following:

(*1*) bathing of the patient in the bed, the tub or in the shower;

**AD-046**

(*2*) dressing;

(*3*) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth;

(*4*) toileting; this may include assisting the patient on and off the bedpan, commode or toilet;

(*5*) walking, beyond that provided by durable medical equipment, within the home and outside the home;

(*6*) transferring from bed to chair or wheelchair;

(*7*) turning and positioning;

(*8*) preparing of meals in accordance with modified diets, including low sugar, low fat, low salt and low residue diets;

(*9*) feeding;

(*10*) administration of medication by the patient, including prompting the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly;

(*11*) providing routine skin care;

(*12*) using medical supplies and equipment such as walkers and wheelchairs; and

(*13*) changing of simple dressings.

(*b*) Before continuous personal care services or live-in 24-hour personal care services may be authorized, additional requirements for the authorization of such services, as specified in clause (b)(4)(i)(c) of this section, must be met.

(6) **Shared aide** means a method of providing personal care services under which a social services district authorizes one or more nutritional and environmental support functions or personal care functions for each personal care

services recipient who resides with other personal care services recipients in a designated geographic area, such as in the same apartment building, and a personal care services provider completes the authorized functions by making short visits to each such recipient.

**(b) Criteria and authorization for provision of services.**

(1) When the local social services department receives a request for services, that department shall determine the applicant's eligibility for medical assistance.

(2) The initial authorization for personal care services must be based on the following:

(i) a physician's order that meets the requirements of subparagraph (3)(i) of this subdivision;

(ii) a social assessment that meets the requirements of subparagraph (3)(ii) of this subdivision;

(iii) a nursing assessment that meets the requirements of subparagraph (3)(iii) of this subdivision;

(iv) an assessment of the patient's appropriateness for hospice services and assessments of the appropriateness and cost-effectiveness of the services specified in subparagraph (3)(iv) of this subdivision; and

(v) such other factors as may be required by paragraph (4) of this subdivision.

(3) The initial authorization process shall include the following procedures:

(i) A physician's order must be completed on the form required by the department.

(*a*) The physician's order form must be completed by a physician licensed in accordance with article 131 of the Education Law, a physician's assistant or a specialist's assistant registered in accordance with article 131-B of the Education Law, or a nurse practitioner certified in accordance with article 139 of the Education Law.

(*1*) Such medical professional must complete the physician's order form within 30 calendar days after he or she conducts a medical examination of the patient, and the physician's order form must be forwarded to a social services district or another entity in accordance with clause (c) of this subparagraph.

(*2*) Such medical professional must complete the physician's order form by accurately describing the patient's medical condition and regimens, including any medication regimens, and the patient's need for assistance with personal care services tasks and by providing only such other information as the physician' s order form requires.

(*3*) Such medical professional must not recommend the number of hours of personal care services that the patient should be authorized to receive.

(*b*) A physician must sign the physician's order form and certify that the patient can be cared for at home and that the information provided in the physician' s order form accurately describes the patient's medical condition and regimens, including any medication regimens, and the patient's need for assistance with personal care services tasks, at the time of the medical examination.

(*c*) Within 30 calendar days after the medical examination of the patient, the physician, other medical professional, the patient or the patient's representative must forward a completed and signed copy of the physician's order form to the social services district for completion of the social assessment; however, when the social services district has delegated, pursuant to subdivision (g) of this section, the responsibility for completing the social assessment to another agency, the physician, other medical professional, the patient or the patient's representative must forward a completed and signed copy of the physician's order form to such other agency rather than to the social services district.

(*d*) When the social services district, or the district's designee pursuant to subdivision (g) of this section, is responsible for completing the social assessment but is not also responsible for

completing the nursing assessment, the district or its designee must forward a completed and signed copy of the physician's order form to the person or agency responsible for completing the nursing assessment.

(*e*) The physician's order is subject to the provisions of Parts 515, 516, 517 and 518 of this Title. These Parts permit the department to impose monetary penalties on, or sanction and recover overpayments from, providers or prescribers of medical care, services, or supplies when medical care, services, or supplies that are unnecessary, improper or exceed patients' documented medical needs are provided or ordered.

(ii) The social assessment shall be completed by professional staff of the social services district on forms approved by the Department.

(*a*) The social assessment shall include a discussion with the patient to determine perception of his/her circumstances and preferences.

(*b*) The social assessment shall include an evaluation of the potential contribution of informal caregivers, such as family and friends, to the patient's care, and shall consider all of the following:

(*1*) number and kind of informal caregivers available to the patient;

(*2*) ability and motivation of informal caregivers to assist in care;

(*3*) extent of informal caregivers' potential involvement;

(*4*) availability of informal caregivers for future assistance; and

(*5*) acceptability to the patient of the informal caregivers' involvement in his/her care.

(*c*) When live-in 24-hour personal care services is indicated, the social assessment shall evaluate whether the patient's home has adequate sleeping accommodations for a personal care aide.

**AD-050**

(*d*) The social assessment shall be completed on a timely basis and shall be current.

(*iii*) The nursing assessment shall be completed by a nurse from the certified home health agency, a nurse employed by, or under contract with, the local social services department, or a nurse employed by a voluntary or proprietary agency under contract with the local social services department.

(*a*) A nurse employed by, or under contract with, the local social services department or by a voluntary or proprietary agency under contract with the local social services department shall have the following minimum qualifications:

(*1*) a license and current registration to practice as a registered professional nurse in New York State; and

(*2*) at least two years of satisfactory recent experience in home health care.

(*b*) The nursing assessment shall be completed within five working days of the request and shall include the following:

(*1*) a review and interpretation of the physician's order;

(*2*) the primary diagnosis code from the ICD-9-CM;

(*3*) an evaluation of the functions and tasks required by the patient;

(*4*) an evaluation whether adaptive or specialized equipment or supplies including, but not limited to, bedside commodes, urinals, walkers, and wheelchairs, can meet the patient's need for assistance with personal care functions and whether such equipment or supplies can be provided safely and cost-effectively;

(*5*) development of a plan of care in collaboration with the patient or his/her representative; and

(*6*) recommendations for authorization of services.

(iv) Assessment of other services.

(*a*) Before authorizing or reauthorizing personal care services, a social service district must assess each patient to determine the following:

(*1*) whether personal care services can be provided according to the patient's plan of care, whether such services are medically necessary and whether the social services district reasonably expects that such services can maintain the patient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health;

(*2*) whether the patient can be served appropriately and more cost-effectively by personal care services provided under a consumer directed personal assistance program authorized in accordance with section 365-f of the Social Services Law;

(*3*) whether the functional needs, living arrangements and working arrangements of a patient who receives personal care services solely for monitoring the patient's medical condition and well-being can be monitored appropriately and more cost-effectively by personal emergency response services provided in accordance with section 505.33 of this Part;

(*4*) whether the functional needs, living arrangements and working arrangements of the patient can be maintained appropriately and more cost-effectively by personal care services provided by shared aides in accordance with subdivision (k) of this section;

(*5*) whether a patient who requires, as a part of a routine plan of care, part-time or intermittent nursing or other therapeutic services or nursing services provided to a medically

stable patient, can be served appropriately and more cost-effectively through the provision of home health services in accordance with section 505.23 of this Part;

(*6*) whether the patient can be served appropriately and more cost-effectively by other long-term care services, including, but not limited to, services provided under the long-term home health care program (LTHHCP), the assisted living program or the enriched housing program;

(*7*) whether the patient can be served appropriately and more cost-effectively by using adaptive or specialized medical equipment or supplies covered by the MA program including, but not limited to, bedside commodes, urinals, walkers, wheelchairs and insulin pens; and

(8) whether personal care services can be provided appropriately and more cost-effectively by the personal care services provider in cooperation with an adult day health program.

(*b*) If a social services district determines that a patient can be served appropriately and more cost-effectively through the provision of services described in subclauses (*a*)(*2*) through (*8*) of this subparagraph, and the social services district determines that such services are available in the district, the social services district must first consider the use of such services in developing the patient's plan of care. The patient must use such services rather than personal care services to achieve the maximum reduction in his or her need for home health services or other long-term care services.

(*c*) A social services district may determine that the assessments required by subclauses (*a*)(*1*) through (*6*) and (*8*) of this subparagraph may be included in the social assessment or the nursing assessment.

(*d*) A social services district must have an agreement with each hospice that is available in the district. The agreement must specify the procedures for notifying patients who the social services district reasonably expects would be appropriate for hospice services of the availability of hospice services and for referring patients to hospice

services. A social services district must not refer a patient to hospice services if the patient's physician has determined that hospice services are medically contra-indicated for the patient or the patient does not choose to receive hospice services.

(v) An authorization for services shall be prepared by staff of the local social services department.

(4) The initial authorization process shall include additional requirements for authorization of services in certain case situations:

(*i*) An independent medical review of the case shall be completed by the local professional director, a physician designated by the local professional director or a physician under contract with the local social services department to review personal care services cases when:

(*a*) there is disagreement between the physician's order and the social, nursing and other required assessments; or

(*b*) there is question about the level and amount of services to be provided; or

(*c*) the case involves the provision of continuous personal care services or live-in 24-hour personal care services as defined in paragraphs (a)(2) and (4), respectively, of this section. Documentation for such cases is subject to the following requirements:

(*1*) The social assessment shall demonstrate that all alternative arrangements for meeting the patient's medical needs have been explored and are infeasible including, but not limited to, the provision of personal care services in combination with other formal services or in combination with voluntary contributions of informal caregivers. In cases involving live-in 24-hour personal care services, the social assessment shall also evaluate whether the patient's home has sleeping accommodations for a personal care aide. When the patient's home has no sleeping accommodations for a personal care aide, continuous personal care services

must be authorized for the patient; however, should the patient's circumstances change and sleeping accommodations for a personal care aide become available in the patient's home, the district must promptly review the case. If a reduction of the patient's continuous personal care services to live-in 24-hour personal care services is appropriate, the district must send the patient a timely and adequate notice of the proposed reduction.

(*2*) The nursing assessment shall document the following:

*(i)* whether the physician's order has documented a medical condition that causes the patient to need frequent assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding;

*(ii)* the specific personal care functions with which the patient needs frequent assistance during a calendar day;

*(iii)* the frequency at which the patient needs assistance with these personal care functions during a calendar day;

(*iv*) whether the patient needs similar assistance with these personal care functions during the patient's waking and sleeping hours and, if not, why not; and

(*v*) whether, were live-in 24-hour personal care services to be authorized, the personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

(*ii*) The local professional director, or designee, must review the physician's order and the social and nursing assessments in accordance with the standards for services set forth in subdivision (a) of this section, and is responsible for the final determination of the amount and duration of services to be authorized.

(*iii*) When determining whether continuous personal care services or live-in 24-hour personal care services should be authorized, the local professional director, or designee, must consider the information in the social and nursing assessments.

(*iv*) The local professional director or designee may consult with the patient's treating physician and may conduct an additional assessment of the patient in the home. The final determination must be made with reasonable promptness, generally not to exceed seven business days after receipt of the physician's order and the completed social and nursing assessments, except in unusual circumstances including, but not limited to, the need to resolve any outstanding questions regarding the amount or duration of services to be authorized.

The following are fair hearing decisions obtained from the state's fair hearing database in which the State Defendant's Designee affirmed MLTC denials of increases to 24-hour personal care. Counsel obtained these documents by searching for search terms involving 24-hour care and affirmance.

NOTE: ALL REFERENCES TO UAS (UNIFORM ASSESSMENT SYSTEM) ASSESSMENT IN HEARING DECISIONS REFER TO THE COMMUNITY HEALTH ASSESSMENT, OR CHA, AS REFERENCED ELSEWHERE IN THIS LITIGATION. THE DEFENDANTS USE BOTH TERMS.

ALL DECISIONS LINKED HERE ARE FROM THE STATE FAIR HEARING DECISION ARCHIVE, LOCATED AT https://otda.ny.gov/hearings/search/

THE ARCHIVE CAN BE SEARCHED FOR ADDITIONAL DECISIONS

(1)

8648573R

https://otda.ny.gov/fair%20hearing%20images/2023-11/Redacted_8648573R.pdf

**Appellant requested an increase from 21 hours weekly to split-shift care. He was temporarily staying in a nursing home because of the inadequate number of care hours. The Agency partially denied, awarding 63 hours weekly. The ALJ reversed the Agency in part, ordering live in care. The ALJ noted that the appellant had proven the need for nighttime incontinence care but that he had not proven that a live-in aide could not get 5 hours of uninterrupted sleep. The appellant's spouse testified that an aide could get 5 hours of uninterrupted sleep**.

The Appellant requires total assistance of another person with incontinence care. It is noted that the request for an increase is based on with assistance ADLs and IADLs because of the Appellant's deterioration, and therefore the request is not based solely on the need for safety and supervision as standalone tasks. The Appellant's spouse testified that she is unable to provide informal care to the Appellant at all, including during the night, due to her own health issues and due to the extent of care the Appellant needs. The Appellant's spouse is unable to assist the Appellant with ambulating, incontinence care, or any other nighttime needs the Appellant may have. This is corroborated by a letter from the Appellant's spouse's doctor which states: "Due to her medical condition, the _____ _____ is not able push, pull, bend, lift."

With respect to whether a live-in aide would likely be able to obtain an uninterrupted five hours of sleep, there is insufficient evidence to conclude that this would not be possible. Given the Appellant's spouse's testimony that the Appellant is able to sleep five hours in a row, and there is no evidence the Appellant requires turning or repositioning every two hours, there is insufficient evidence to conclude a live-in aide would not be able to obtain an uninterrupted five hours of sleep if live-in services were authorized.

At a fair hearing concerning the denial of Medicaid services, the burden is on the Appellant to establish that the Plan's determination was incorrect. After careful consideration of all the evidence in the record, it is determined the Appellant's nighttime needs cannot be met by the use of adaptive or specialized equipment or voluntary assistance from informal caregivers. The Appellant requires assistance at night and the care required is sufficiently infrequent that the aide is likely to obtain five hours or uninterrupted sleep during an eight-hour period. Accordingly, the record establishes that the Appellant is in need of 24-hour live-in care. Therefore, the Plan's August 10, 2023 determination to deny the Appellant's request for an increase of Personal Care Services to 24-hour split shift coverage was correct and is sustained. However, the Appellant has met his burden to establish that the

==Plan's determination as to the adequacy of the Appellant's Personal Care Services in the amount of 63 hours per week is incorrect and is reversed.==

(2)

7169793L

https://otda.ny.gov/fair%20hearing%20images/2015-12/Redacted_7169793L.pdf

**Appellant had a diagnosis of Alzheimer's disease, stroke and unsteady gait. She requested an increase from 12 hours daily to split shift care. The agency denied, stating that member had no significant functional or cognitive changes but on further review noted that the appellant had worsened incontinence. The agency determined that appellant qualified for live-in service. The ALJ affirmed the agency's determination. The ALJ found that the extra hours sought were for standalone safety monitoring and could not be authorized.**

The record establishes that the Appellant, _____, resides with her daughter and representative, _____ _____ , and has been in receipt of a Medical Assistance authorization for Personal Care Services in the amount of 84 hours weekly, 12 hours daily, 7 days weekly, through _____ _____ ____,, a Managed Long Term Care Plan, hereinafter, "MLTCP."

taking weight...Change in ADL status as compared to 90 days ago, or since last assessment if less than 90 days: No change... Overall self-sufficiency has changed significantly as compared to status 90 days ago, or since last assessment if less than 90 days: Deteriorated..."

==At the hearing, Appellant's representative testified that Appellant needs to use the bathroom/have diaper changes 2-3 times per night. Her main concern, however, was Appellant's agitation and need for safety monitoring. The representative testified that Appellant, if left unattended, will smear feces, try to get out of bed, even though the bed has a gate. Appellant's representative submitted a letter from Appellant's doctor, dated November 5, 2015, stating, in relevant part, that "The family brought her (Appellant) to this clinic when she begin to exhibit aggressive behaviors...climbing over the windows in order to get out of the house and was becoming a danger to herself and others...she needs 24 hours shift of supervision...."==

 Pursuant to Section 505.14(a) of the Regulations Continuous 24 hour personal care services shall be provided when the person due to her medical condition requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night.

**AD-059**

The record does not establish that Appellant is eligible for the relief requested as it has not been demonstrated that Appellant needs total assistance with toileting, walking, transferring or feeding at unscheduled times during the day and night. Appellant's night time toileting needs do not appear to be excessive, such that a sleep-in aide could not perform the needed tasks. Appellant's representative's request for 12 hours x 2 daily, 7 days weekly, continuous care by more than one aide, "split-shift services, appears to be mainly based upon the need for safety supervision, which the MLTCP only provides incidental to required tasks, not as an independent, stand-alone task. The MLTCP reevaluated Appellant and based upon the record of this hearing correctly increased Appellant's Personal Care Services to 24 hours continuous care, provided by one aide, 7 days weekly, "sleep-in" services.

As Appellant's representative contended that Appellant's condition markedly deteriorated since the most recent assessment, that Appellant is no longer as active as she had been, and that, the representative was unaware that she could request that Appellant be reassessed, a request for reassessment by Appellant may be appropriate in this case.

Accordingly, the MLTCP's determination denying Appellant's request for Personal Care Services of 12 hours x 2 daily, 7 days weekly, continuous care by more than one aide, "splitshift" services and increasing Appellant's Personal Care Services from 84 hours weekly, 12 hours daily, 7 days weekly to 24 hours continuous care provided by one aide, 7 days weekly, "sleep-in" services is correct and is sustained.

(3)

8649788L

https://otda.ny.gov/fair%20hearing%20images/2024-2/Redacted_8649788L.pdf

**The Appellant, age 85, requested an increase from 35 hours per week to split shift care. The Plan increased to 56 hours per week. The Plan was affirmed. The ALJ found that the only issue presented by the Appellant's family member witness, who stayed with Appellant at night, was a request for standalone safety monitoring at night and that is not a service required to be provided by the PCS program.**

At the hearing, the Appellant's daughter in law testified that the Appellant was in a rehabilitation facility due to a hip fracture from November, 2022 to February, 2023. She stated that the Appellant has suffered falls and displays violent behavior. She stated that she stays with the Appellant all night. She stated that the Appellant gets up throughout the night. The Appellant's daughter in law stated that the Appellant will try to open the door when he is left alone. She stated that she has to monitor the Appellant all the time because if he tries to get up he can fall down. She stated that the Appellant is confused and cannot be left alone. She noted that she needs someone to monitor the Appellant at night. She stated that she does not want the Appellant to go to a nursing home.

**AD-060**

Per General Information System message GIS 03 MA/03, agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized (see GIS 99 MA/013, GIS 99 MA/036). Such GIS reminds agencies that a clear and legitimate distinction exists between "safety monitoring" as a non-required independent standalone function while no Level II personal care services task is being provided, and the appropriate monitoring of the patient while providing assistance with the performance of a Level II personal care services task, such as transferring, toileting, or walking, to assure the task is being safely completed.

assistance.

The Appellant's daughter in law testified as to concerns about the Appellant's safety during the overnight hours due to him waking up and falling or wandering. As detailed above, the Plan is not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized. Accordingly, the Plan was correct not to authorize split shift services for safety and supervisory concerns. Furthermore, the record does not establish that the Appellant has needs with such frequency that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep.

In sum, the testimony expressed at the hearing, as well the documentary evidence, were meticulously reviewed and considered. This evidence did not, however, establish the Appellant's eligibility for 24 hour split shift care. While the Appellant's needs might include standalone supervision and monitoring, this type of custodial care is not available under this Medicaid program. While the Appellant's situation is sympathetic, the Appellant has not met her burden in this matter. Accordingly, the Plan's determination to partially deny the request for an increase to the Appellant's personal care services authorization from 35 hours per week to 24-Hour split shift personal care services, and provide the Appellant with an authorization of 56 hours per week was correct and is affirmed.

It is noted that while the PCS program does not provide standalone safety monitoring, the Appellant may wish to inquire with the Plan regarding the NHTD 1915(c) Medicaid waiver program for safety and supervision during the overnight hours.

(4)

8314935J

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8314935J.pdf

**The Appellant's mother requested an increase in services from 24 hours weekly to live-in service. The Plan denied the increase. The Plan was affirmed. The only unmet need the Appellant's mother could identify was a need for standalone safety monitoring. Plan's determination to deny the request for an increase in the Appellant's personal care services authorization from 24 hours per week to 24-Hour live-in personal care services was correct and is affirmed.**

**AD-061**

At the hearing, the Appellant's mother testified that her son has been falling frequently. She stated that the Appellant is unable to cook or take care of himself. She stated that the Appellant has been to emergency care many times. The Appellant's mother testified that the Appellant needs medication reminders. She expressed concerns about the Appellant wandering outside and falling. She stated that the Appellant does not remember medical appointments or to shower.  She stated that the Appellant suffers from schizophrenia and insomnia. The Appellant's mother stated that she needs assistance caring for the Appellant.

Regulations state that, at a hearing regarding the denial of or the adequacy of Medical Assistance benefits, the Appellant must establish that the Plan's denial of assistance or benefits was not correct or that the Appellant is eligible for a greater amount of assistance or benefit.

While concerns over the Appellant's safety are noted, per General Information System message GIS 03 MA/03, agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized (see GIS 99 MA/013, GIS 99 MA/036). Such GIS reminds agencies that a clear and legitimate distinction exists between "safety monitoring" as a non-required independent standalone function while no Level II personal care services task is being provided, and the appropriate monitoring of the patient while providing assistance with the performance of a Level II personal care services task, such as transferring, toileting, or walking, to assure the task is being safely completed. Managed Long Term Care Policy 16.07 states that, when an enrollee requires safety monitoring, supervision or cognitive prompting to assure the safe completion of one or more IADLs or ADLs, the task based assessment tool must reflect sufficient time for such safety monitoring, supervision or cognitive prompting for the performance of those particular IADLs or ADLs. Safety monitoring, supervision and cognitive prompting are not, by themselves, independent or "stand-alone" IADLs, ADLs, or tasks.

Even crediting the testimony, the Plan's determination is correct. The Appellant's mother expressed concerns about the Appellant wandering and falling while left alone. However, as detailed above, agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized. The Appellant's mother also noted that he needs assistance with ADLs/IADLs including meal preparation, medication management, and bathing. However, nothing in the record demonstrates that the Appellant needs assistance with such frequency as to warrant 24/7 care.

Medical documentation was submitted on the Appellant's behalf at the hearing and to the Plan. This documentation includes (but is not limited to): a _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ __. While this documentation highlights the Appellant's medical conditions, medications and clinical treatments, it does not establish what ADLs/IADLs the Appellant would require 24 hour assistance with.

The Appellant may wish to inquire with the Plan regarding the Medicaid NHTD 1915(c) waiver program for safety monitoring services.

(5)

8692921N

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8692921N.pdf

**The Appellant, age 98, requested an increase from live-in to split-shift care. The Plan denied, saying that the appellant's was reporting a need for standalone safety monitoring and nothing else. The plan was affirmed. The facts were uncontroverted. The Appellant's witness testified that the aide if increased would "monitor" the Appellant. The Appellant did not meet the burden of proof**.

.

At the hearing, the Appellant's daughter testified that the Appellant suffers from severe dementia. She stated that the Appellant wakes up during the night and the live-in aide does not get up to assist the Appellant. She stated that because of this there is a problem with falls, as the Appellant gets up and walks around, forgetting her walker. She stated that the Appellant has fallen numerous times. The Appellant's daughter stated that the Appellant is on sleeping medication, but it does not work sometimes. She stated that the nighttime aide would be monitoring the Appellant. She stated that she believe the Appellant will be safer with 24/7 splitshift care than live-in.

Regulations state that, at a hearing regarding the denial of or the adequacy of Medical Assistance benefits, the Appellant must establish that the Plan's denial of assistance or benefits was not correct or that the Appellant is eligible for a greater amount of assistance or benefit.

While concerns over the Appellant's safety are noted, per General Information System message GIS 03 MA/03, agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized (see GIS 99 MA/013, GIS 99 MA/036). Such GIS reminds agencies that a clear and legitimate distinction exists between "safety monitoring" as a non-required independent standalone function while no Level II personal care services task is being provided, and the appropriate monitoring of the patient while providing assistance with the performance of a Level II personal care services task, such as transferring, toileting, or walking, to assure the task is being safely completed.

Here, the Appellant's daughter testified that the Appellant will wake up during the night while the live-in aide is asleep and walk around her home. She expressed concerns regarding the Appellant's fall risk, as well as issues with prior falls. She stated that while the Appellant takes a sleeping medication, it sometimes does not work. While the Appellant's

situation is sympathetic, as detailed above, plans are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized. In addition to this, eligibility for split shift care requires the need for assistance [to] be so frequent that an aide would be unlikely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide´s eight-hour period of sleep. Other than safety monitoring, the record fails to demonstrate that the Appellant has a need for assistance with ADLs/IADLs which is so frequent that it would prevent the aide from getting 5 hours of un-interrupted sleep.

The medical documentation submitted on behalf of the Appellant was also reviewed. While this documentation shows the Appellant's medical conditions, medication and treatments, it does not establish the medical necessity of 24 hour live-in care, nor that such care is required for purposes beyond safety and supervision.

In sum, the testimony expressed at the hearing, as well the documentary evidence, was carefully reviewed. This evidence fails to establish the Appellant's eligibility for 24 hour split shift care. While the Appellant's needs might include standalone supervision and monitoring, this type of custodial care is not available under this program. The Appellant has not met her burden in this matter. Accordingly, the Plan's determination to deny the request for an increase in the Appellant's personal care services authorization from live-in 24-hour personal care services to 24-Hour split shift personal care services was correct and is affirmed. It is noted that the Appellant may wish to inquire with the Plan regarding the NHTD 1915(c) Medicaid waiver program for safety and supervision during the overnight hours.


(6)

8709470H

https://otda.ny.gov/fair%20hearing%20images/2024-4/Redacted_8709470H.pdf

**The appellant requested an increase from live-in to split-shift care. The Plan denied, noting that the Appellant had no medical needs identified that required the increase. The Plan was affirmed, as the member's documentation showed a concern only with safety monitoring. The Appellant's witness presented medical documentation showing a later deterioration in condition, but the Agency was still correctly affirmed as to its original decision**.

The Plan's November 2, 2023 determination to deny the Appellant's request for an increase in personal care services (PCS) hours to 24-hour split shift care was correct. The Plan representative confirmed that the Appellant's request to increase PCS hours from increase in personal care services (PCS) hours from 24 hour live in care to 24-hour split shift care was denied by the Plan due to a lack of medical necessity.

The Appellant appeared at the hearing and his Daughter/POA also appeared at the hearing. The Appellant's Daughter confirmed that the Appellant lives alone. She first explained that

the Appellant's medical condition has significantly declined since the Agency's November 20, 2023 determination. She stated that there has been at least four incidents in the last two months where the Appellant got up in the middle of the night and he fell at least three times during those incidents. The Appellant's Daughter stated that the Appellant must be monitored 24 hours a day for safety reasons and because the live in aides cannot get five hours of uninterrupted sleep. She explained that the aides have to get up to care for the Appellant at least every two hours every night. She presented sleeping logs from December 2023 and January 2024 signed by the aides which show that they are getting up at lease every two hours at night to care for the Appellant. She stated that at the time of the November 2023 assessment and the November 2023 Plan determination the Appellant could still walk on his own. However, she explained that since that time he became wheelchair bound and can no longer walk. The Appellant's Daughter testified that the aides have to help the Appellant to the bathroom at night and have to change his incontinence pads. Lastly, she stated that the Appellant's doctor has told them that the Appellant now has to be turned and repositioned every hour including overnight to treat his bed sores and rashes.

Pursuant to current regulations, 24-hour split-shift personal care services means the provision of care by one personal care aide for an individual who, because of the individual's medical condition, needs assistance during a calendar day with toileting, walking, transferring, turning and positioning, or feeding and whose need for assistance is sufficiently infrequent that a live-in 24-hour personal care aide would be likely to obtain, on a regular basis, five hours daily of uninterrupted sleep during the aide's eight hour period of sleep. When determining whether 24-hour live-in care is appropriate multiple factors must be considered including the specific task or tasks with which the person requires frequent assistance during the night, the frequency at which the person requires assistance with these tasks during the night, the ability to use medical supplies or equipment to meet these needs, and whether an aide would likely be able to obtain an uninterrupted five hours of sleep were live-in services to be authorized.

The Appellant's Daughter testified that the Appellant's condition had really deteriorated since the assessment and denial notice in November 2023. While she did present a doctor's note and sleep logs these documents are all dated in December 2023 and January 2024 and therefore did not establish the Appellant's condition at the time of the denial in November 2023.

At a fair hearing concerning the denial of Appellant's request for an increase in PCS hours, the burden is on the Appellant to establish need for a requested increase. In this case, there is insufficient evidence to establish that in November 2023 the Appellant has specific personal care service tasks for nighttime needs which would render him eligible for 24-hour split-shift care. Accordingly, the Appellant failed to meet this burden and the Plan's determination is sustained.

The Appellant can always make a new request 24 hour split-shift care and submit new and current medical documentation.

**AD-065**

(7)

8649048Z

https://otda.ny.gov/fair%20hearing%20images/2024-4/Redacted_8709470H.pdf

**The Appellant, age 89, requested an increase to live-in care from 36 hours weekly. The Plan increased to 42 hours weekly but denied the live-in, noting that at the time of the assessment the member did not show any nighttime needs that would require live-in care. The appellant's assessment showed only infrequent incontinence and no other needs. The Plan was affirmed**.

. Hours beyond those currently authorized would be for safety monitoring, which is not a covered benefit under the PCA program. Your hours will remain at 42 hours weekly."

The record reflects that on May 8, 2023, a nurse assessor completed a Comprehensive Community Health Assessment of the Appellant, finding the Appellant required extensive assistance with: bathing, dressing upper body, dressing lower body, locomotion, toilet transfer, toilet use, was independent with eating and walked with an assistive device. In addition, this assessment found the Appellant was "infrequently incontinent – not incontinent over last 3 days, but does have incontinent episodes" of bladder, and continent of bowel.

The record further reflects that on July 26, 2023, a nurse assessor completed a Comprehensive Community Health Assessment of the Appellant, finding the Appellant required extensive assistance with: bathing, dressing lower body, limited assistance with: dressing upper body, locomotion, toilet transfer, toilet use, and was independent with eating. This report also found she could walk using an assistive device, and that she was "occasionally" incontinent of bladder (less than daily) and continent of bowel.

At a fair hearing concerning the denial of an application for, or the adequacy of, Medical Assistance, the Appellant must establish that the denial of assistance or benefits was not correct or that the Appellant is eligible for a greater amount of assistance or benefits.

The Appellant's representative _____ _____, her Personal Care Aide, stated that the Appellant's abilities to do her activities has become much worse after she was hospitalized and then stayed in a nursing home until about two weeks prior to this Fair Hearing. Appellant stated that she has a balance problem, so she has fallen a few times. She stated she is now in a wheelchair, where before, she was using a walker to walk and that now, her personal care aide has to physically transfer her between the wheelchair and the bed. The Appellant also submitted a letter from her doctor _____ _____ dated March 1, 2024, who stated in part that the Appellant was in the hospital in October 2023 due to a vascular procedure and then was in a rehabilitation center. He further stated "she is currently at home, imbalanced while walking with recurrent pain in left leg preventing her from walking and her usual activities. She has history of multiple falls. Patient has left lower leg pain while walking, has difficulty to ambulate, uses Rollator or wheelchair with assistance of

**AD-066**

home care aid…at home needs assistance at times to go to the bathroom, to groom and clean." The Appellant also submitted discharge summary records from the nursing home stating she was admitted there on November 14, 2023 and discharged February 22, 2024. This discharge summary also stated the Appellant's "course of condition during stay" as "steady improvement" and the nursing home's recommendations were "home OT/PT assessment to assist with transition back to home environment."

The Appellant's recent experience after a hospitalization and nursing home stay through February 2024 are noted. However, the negative changes the Appellant and Ms. _____ mentioned are not reflected on either of the UAS assessments, which are from 2023, and in fact, improvements were noted to several of her activities of daily living at the time of the July 26, 2023 assessment. It is noted that the UAS assessments both state the Appellant is continent of bowel and only occasionally incontinent of bladder and that she could as of July 26, 2023 complete her ADLs of dressing upper body, locomotion, toilet transfer, toilet use with limited assistance only, which previously required extensive assistance. Furthermore, the doctor's letter noted that the Appellant is able to variably use a walker or a wheelchair, although her balance is poor, not that she is confined solely to a wheelchair.

It is noted that the Appellant's condition, as she stated, may have declined since the more recent hospitalization, however, this occurred several months after the latest assessment was done and thus was not part of the Plan's determination at issue. Accordingly, the Plan's August 9, 2023 determination that the Appellant did not require an increase in personal care service hours from 36 hours per week to 24-hour live-in, and instead giving her 42 hours per week, is sustained.

The Appellant and her representative are reminded that they may request a new assessment to reflect her up to date physical functioning, and they may make a new request for adjusted PCS hours and include any relevant supporting medical documentation for consideration.

(8)

8714351P

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8714351P.pdf

**The appellant requested an increase form 63 hours weekly to split shift care. The Plan denied, noting that the assessment showed no nighttime needs. The Plan was affirmed. While the Appellant's daughter discussed the appellant's need for help with diapers and incontinence, there was no documentation of these issues in the record. The Appellant's daughter also focused mostly on the need for standalone safety monitoring**

The Plan's determination to deny the Appellant's request for an increase in personal care services (PCS) hours from 63 hours per week to 24-hour split shift care was correct.

The Plan representative confirmed that the Appellant's request to increase PCS hours from 63 hours per week to 24-hour split shift care was denied by the Plan. The Plan based their decision on the Appellant's needs as evidenced by the December 2023 nurse assessment which contained no indication that the Appellant had any nighttime needs. The Plan representative noted that only when nighttime needs cannot be met with other assistive equipment, devices or voluntary assistance is 24-hour split shift care appropriate. She stated that although the Appellant has been diagnosed with _____ and other medical conditions , her personal care needs could be scheduled, and the Appellant successfully utilized incontinence supplies to assist with any incontinence issues. She stated that the Appellant had not submitted any medical documentation to show that the Appellant had any other unmet nighttime needs, such as repositioning or turning. The Plan representative lastly stated that the Appellant was seeking nighttime hours for safety supervision but the Plan is not required to authorize PCS hours for safety supervision as a stand-alone task.

The Appellant's Daughter appeared at the hearing on the Appellant's behalf. The Appellant's Daughter stated that the Appellant lives alone and is incapable of taking care of herself due to her _____ diagnosis. She explained that her main concern for the Appellant was the nighttime hours because the Appellant often gets up in the night and screams or she wanders around her house. She stated that the Appellant has fallen a few times at night and she has now installed a camera in the house so she can see if the Appellant gets out of bed. The Appellant's Daughter explained that when she sees the Appellant get up on the camera she has to go over there to help the Appellant because she cannot do anything for herself.

The Appellant's Daughter testified that the aide leaves for the day at 8 PM and the aide gives the Appellant food and water before she leaves but the Appellant is then unable to find it when she is alone. She also explained that while the Appellant uses incontinence pads at night, the Appellant will often take them off in the middle of the night. She stated that the Appellant has gotten rashes in the past as a result of the incontinence pads being taken off during the night.

The Appellant requested 24-hour split-shift care which requires that the Appellant has nighttime needs of such frequency that a personal care aide would not be able to obtain 5 hours of uninterrupted sleep within an 8-hour period. The Appellant's Daughter did not establish, by testimonial or documentary medical evidence, specific personal care service tasks for the Appellant's nighttime needs that occur on a regular basis that would render her eligible for 24- hour split-shift care. There was no medical documentation submitted which established the need for the Appellant to be changed at night and there was no medical documentation submitted to establish that the Appellant needed to be turned or repositioned at night. Moreover, the Appellant's Daughter acknowledged that the main reason for seeking split-shift aides was for safety supervision due to the Appellant's wandering and forgetfulness. However, under the above regulations the Plan is not required to authorize PCS hours for safety supervision as a stand-alone task.

At a fair hearing concerning the denial of Appellant's request for an increase in PCS hours, the burden is on the Appellant to establish need for a requested increase. In this case,

**AD-068**

there is insufficient evidence to establish that the Appellant has specific personal care service tasks for nighttime needs which would render her eligible for 24-hour split-shift care. Accordingly, the Appellant failed to meet this burden and the Plan's determination is sustained.

It is noted that the Plan representative suggested that the Appellant inquire about the Nursing Home Transition and Waiver Program if there is a concern of the Appellant wandering and safety as a stand-alone function. If the Appellant's medical condition has deteriorated, the Appellant can request a reassessment and submit new medical documentation, including a physician's order, regarding the Appellant's current condition and her overnight medical needs.

(9)

8718386N

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8718386N.pdf

**The Appellant requested an increase from 14 hours weekly to live-in care after a fall where she permanently injured one arm and could not complete many tasks. The Agency approved an increase to 35 hours weekly but denied the further increase, noting that there was no nighttime need shown despite the injury. The Plan was affirmed because the Appellant's request for nighttime aide service was based on a request for standalone safety monitoring.**

The Agency summary stated the Appellant was authorized for Personal Care Aide (PCA) services in the amount of 14 hours per week. The Appellant fell on October 20, 2023 and her left upper arm became stuck between the inside of two drawers. The Appellant was unable to take out hand and as a result of the injury she suffered necrotizing fasciitis secondary to blood circulation loss. The Appellant was hospitalized and then discharged to a Rehab Center on November 13, 2023. The Appellant requested an increase in hours to 24 hours live in. The Agency said a UAS was conducted on December 1, 2023. The Agency said the Initial Adverse Determination partially denied the increase and approved 24.5 hours. An appeal was filed and by Final Adverse Determination dated December 22, 2023 the Agency partially denied the request for 24 hours live in and approved 35 hours.

The Appellant was represented by her Daughter, Appellants Representative (AR). The AR said the Appellant is unable to use her left hand. The AR said the Appellant's left hand is frozen and she cannot use it. The AR said that because of the injury the Appellant is unable to dress herself or cook because she can only use one hand.

In addition, the AR said it is dangerous for the Appellant to be unattended. The AR said if the Appellant is alone she might fall and injure herself. The AR said the Appellant's current injuries happened because she was alone and not supervised.

**AD-069**

When determining whether a person requires 24-hour care, the agency must consider whether the physician's order and other required assessments document the existence of a medical condition that directly causes the person to need frequent assistance with personal care services tasks during the night; the specific task or tasks with which the person requires frequent assistance during the night; the frequency at which the person requires assistance with these tasks during the night; whether the person requires similar assistance with these tasks during the daylight hours and, if not, why not; the informal supports or formal services that are willing, able and available to provide assistance with the person's nighttime tasks; the person's ability to use adaptive or specialized equipment or supplies to meet his or her documented medical need for assistance with nighttime tasks; and whether the person's physician has documented that, due to the person's medical condition, he or she could not safely use the equipment or supplies; and whether a live-in aide would likely be able to obtain an uninterrupted five hours of sleep were live-in services to be authorized.

.

Based on the totality of the evidence the Plan's new authorization of 35 hours per week affords sufficient time for the aide to assist with all the Appellant's personal care tasks, The AR was asked why the Appellant needed more hours the AR said the Appellant needs supervision and cannot be left unattended. As the above regulations state hours cannot be authorized for companionship or safety and security. The Plan indicated that this new authorization would afford sufficient time for the aide to assist with all the Appellant's personal care tasks, noting that the Appellant could split her aide's shift into morning and evening hours to best meet her current care needs. The Plan stated that the Appellant did not have a medical condition that warranted being up throughout the night and time could not be provided for companionship or safety supervision when no tasks are being done. Accordingly, the Plan was correct.

(10)

8706719R

https://otda.ny.gov/fair%20hearing%20images/2024-2/Redacted_8706719R.pdf

**The Appellant, age 70, requested an increase from 35 hours weekly to live-in service. The Plan denied, noting that there was no demonstration of nighttime needs. The evidence at the hearing discussed an even further increase to split-shift care. The evidence showed requests for additional help with daytime scheduled tasks, such as doctor's visits, which could be arranged without a further increase. There was discussion of nighttime diaper changing, but the information was vague and there was no medical documentation presented. Further requests focused on standalone safety monitoring. The Plan was affirmed as to its original determination.**

At the hearing, the Appellant's son testified that the Appellant is not able to do things on her own. He stated that the Appellant recently suffered a major fall requiring hospitalization and rehabilitation. He further stated that after being discharged home, the Appellant suffered another fall 48 hours later and was again hospitalized, this time for two months. The Appellant's son testified that the Appellant spends most of her time in bed because she is afraid of falling. He noted that the current hours are not enough to meet the Appellant's needs. He stated that it is not a safe environment for the Appellant to be home alone. He further stated that the aide would assist the Appellant with cooking, feeding, dressing, showering, medical escorts, toileting if the hours were increased. The Appellant's son noted that the Appellant suffers from insomnia and expressed concerns about the Appellant getting up at night and falling. He stated that the Appellant wears a diaper while the aide is not present and has experienced UTIs, as she cannot change it herself. The Appellant's son was asked how frequently the Appellant would need her diaper changed. He was unable to provide an answer as to how frequently but noted that the Appellant goes "frequently".

While concerns over the Appellant's safety are noted, per General Information System message GIS 03 MA/03, agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized (see GIS 99 MA/013, GIS 99 MA/036)., independent or "stand-alone" IADLs, ADLs, or tasks.

Even crediting the testimony, the Plan's determination is correct. The Appellant's son expressed concerns regarding the Appellant's fall risk and her being alone for so long. However, as detailed above agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized. Safety monitoring, supervision and cognitive prompting are not, by themselves, independent or "stand-alone" IADLs, ADLs, or tasks. The Appellant's son noted that the Appellant's need for assistance with cooking, feeding, dressing, showering, medical escorts, and toileting. It is noted that the Appellant receives daily time for all of the aforementioned tasks, sans medical escorts. The Appellant may wish to contact the Plan in advance of medical appointments to inquire about addition time on an as needed basis.

While the Appellant's situation is sympathetic, the evidence and arguments have been carefully reviewed and it is found that the Appellant has not met her regulatory burden to establish that she required an increase to 24/7 split shift care. Accordingly, the Plan's determination to deny the request for an increase in the Appellant's personal care services authorization from 5 hours per day, 7 days per week, 35 hours per week total to live-in 24-hour personal care services was correct and is affirmed. It is noted that the Appellant or her representative may wish to inquire with the Plan regarding as to whether the Appellant is eligible under the NHTD 1915(c) Medicaid waiver program for safety monitoring and supervision services.

(11)

8701032R

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8701032R.pdf

**The Appellant requested an increase from 70 hours weekly to live-in service. The Plan denied, noting the appellant was requesting nighttime help for standalone safety monitoring, which is not a covered benefit. The Plan was affirmed. The evidence did not show anything to the contrary**.

On September 26, 2023, a registered nurse assessor completed a UAS-ATSP Summary of Hours Recommended/Tas ___ Tool which recommends the need for personal care services in the amount of 36 hours per week to meet the Appellant's ADLs and IADLS.

Appellant's daughter spoke on behalf of the Appellant and explained that Appellant should not be left alone because she wanders away from the home. She also stated that Appellant needs more support at night due to insomnia. The Plan's representative explained that the Plan noted the Appellant's needs for activities of daily living and factored the Appellant's needs in its authorization of personal care services in accordance with the applicable authority cited above.

The Plan's representative noted that the Plan authorized 70 hours per week of personal care services and there are no personal care tasks that have not been addressed by the Plan. The Plan noted that it is authorizing about double the amount of time recommended in the Tas ___ Tool recommendation, which calculated 36 hours per week. The Plan noted that the additional hours requested are not related to a task ability decline and is strictly for standalone safety, supervision, and or monitoring.

.

At a hearing concerning the denial of services, the Appellant must establish that the Plan's denial was incorrect. In this case, although the Appellant's daughter explained she would like live-in 24-hours personal care services for the Appellant, the testimony provided was not sufficient to establish a need for this level of care to meet the Appellant's ADLs and IADLS. Appellant's daughter did not present persuasive evidence showing the UAS assessment was improperly conducted or that Appellant's personal care needs and her physical/mental health was not properly assessed.

As such, the Plan correctly determined to authorize personal care services for Appellant in the amount of 70 per week and to deny the request for an increase to live-in 24-hour personal care services. The record does not demonstrate any error in this matter and therefore the Plan's determination is sustained.

(12)

8733325Y

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8733325Y.pdf

**The Appellant requested an increase from 84 hours weekly to split-shift care. The Plan authorized live-in care, noting that the Appellant had not demonstrated the satisfaction of the additional nighttime frequency requirements for split-shift care. The Plan was affirmed. The evidence showed that the Appellant's daughter could only demonstrate that she preferred split-shift care, not that a medical need was being ignored.**

The Plan's representative explained that the Plan noted the Appellant's needs for activities of daily living and factored the Appellant's needs in its authorization of personal care services in accordance with the applicable authority cited above. The Plan's representative noted that the Plan authorized 24-Hour Live-in personal care services and there are no personal care tasks that have not been addressed by the Plan. The Plan noted its position that Live-in care would be sufficient to support Appellant's needs for activities of daily living, including personal hygiene, toileting/incontinence care, bathing, dressing upper body, dressing lower body, and eating.

At a hearing concerning the denial of services, the Appellant must establish that the Plan's denial was incorrect. In this case, although the Appellant's daughter-in-law explained she would like 24-Hour split-shift care for the Appellant, the testimony provided was not sufficient to establish a need for this level of care to meet the Appellant's ADLs and IADLs. Appellant's daughter-in-law did not present persuasive evidence showing the UAS assessment was improperly conducted or that her personal care needs and her physical/mental health was not properly assessed. The record does not demonstrate any error in this matter and therefore the Plan's determination is sustained.

(13)

8735673Z

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8735673Z.pdf

**The Appellant requested an increase from 58 hours weekly to live-in care. The Plan denied the request, noting that the appellant did not show the need for nighttime care. Although the appellant requested help with toileting at night, the record showed her incontinence supplies were sufficient. The record also showed that the Appellant was requesting help with oxygen administration, a task that PCS care aides are not permitted to do. The Plan was affirmed.**

The Appellant's representative testified regarding the Appellant's nighttime needs for assistance with toileting, incontinence care, and administering oxygen.

The January 15, 2024 UAS assessment report indicated that the Appellant is frequently incontinent of bladder. The Appellant utilizes durable medical equipment (pull-ups, liners) during the nighttime hours. There was no medical evidence provided on this record establishing the medical need for the Appellant to be changed from her incontinence supplies with any amount of frequency during the nighttime hours. There is no evidence of the presence of a pressure ulcer, skin ulcer, major skin problems, skin tears or cuts. There is no evidence the Appellant is suffering from an infection or other medical problem which prevent the incontinence supplies from meeting the Appellant's nighttime needs. Further, there is no evidence the Appellant has a pressure ulcer or wound that would require frequent turning and positioning during the overnight. The Appellant did not submit medical evidence establishing a medical reason related to ADL or IADL tasks necessitating overnight care. Although the concerns for the Appellant's cleanliness following a night of incontinence are compelling, the testimony provided on this record is insufficient to warrant an increase in care to 7 days per week live-in 24-hour care.

It is also noted that the Appellant is authorized to receive PCS and that assistance with administering oxygen falls outside the scope of a personal care assistant's duties. Thus, the Appellant's needs for assistance with administering oxygen at night are not be considered in determining her eligibility for live-in 24-hour.

At a fair hearing concerning the denial of an application for or the adequacy of Medical Assistance, the appellant must establish that the agency's denial of assistance or benefits was not correct or that the appellant is eligible for a greater amount of assistance or benefits. On this record, the Appellant, through her representative has met not the regulatory burden to establish that she needs an increase in her PCS authorization to live-in 24-hour care.

Accordingly, the Plan's determination is affirmed.


(14)

8748058H

https://otda.ny.gov/fair%20hearing%20images/2024-3/Redacted_8748058H.pdf

**The Appellant requested an increase from 63 hours weekly to split-shift care. The Plan denied, noting that the Appellant's son was merely asking for standalone safety monitoring. The Plan was affirmed in part, because the ALJ found that or the Appellant slept through the night on most instances. The Appellant's son testified that he was concerned for his mother's safety but offered no medical evidence to support the change in nighttime service. The ALJ, however, granted an increase to 84 hours weekly (12 hours daily).**

**AD-074**

The Appellant's ADL status has declined and overall self-sufficiency has deteriorated.  The Appellant is frequently incontinent of bladder and occasionally incontinent of bowel.

The Plan determined to deny the request for an increase in the Appellant's personal care services authorization from 63 hours per week (9 hours x 7 days) to 24-Hour split shift personal care services.

At the hearing, the Appellant's son testified that she lives alone and had a fall in December 2023, causing a punctured lung and fractured ribs.  Her cognitive condition is declining and she experiences bouts of confusion.  During the hospital stay following the fall, she received a lot of anesthesia which has also caused her condition to worsen.  He testified that he is seeking 24 hour split shift care because he needs someone to watch and help her and make sure she is safe.  Her night time needs include toileting and tending to a constant chronic cough which causes phlegm and a risk of choking.  The cough has been going on for the past ten months.  She needs help transferring to the commode.  Generally, the Appellant goes to sleep between 9 and 10 pm and wakes up at 9:00 or 9:30 am. Sometimes she forgets and tries to get out of bed herself.  She has diverticulosis which causes incontinence when it flares up.  Due to a fall three years ago, she has a fused left elbow at a 90 degrees, making her left arm completely useless.  The Appellant's son submitted a letter from her doctor who recommends 24 hour care.

.

Testimony from the Appellant's son is sympathetic; however, the testimony establishes that much of the Appellant's night time need is for safety monitoring as a stand-alone task, for which the Plan is not required to allot time.  In addition, the letter from Dr. _____ _, dated February 22, 2024, states the main reason for the 24 hour care request is that the Appellant cannot be left unattended, which indicates the need is for safety monitoring rather than assistance with Level II tasks.  However, given the Appellant's decline and comorbidities, the Appellant would benefit from an increase in personal care services from 9 hours per day to 12 hours per day, 7 days per week.

Based on the foregoing, the Plan's determination was correct but cannot be sustained in full.

(15)

8667355L

https://otda.ny.gov/fair%20hearing%20images/2024-2/Redacted_8667355L.pdf

**The Appellant, age 65, requested an increase from 12 hours daily service to split shift. The Plan denied, noting that the record showed no nighttime needs.  The Plan was affirmed.  While the evidence showed that the Appellant had an increase in**

**incontinence after the assessment in question, the record showed that the original determination was correct.**

By Initial Adverse Determination Notice dated September 18, 2023, the Plan determined to deny the request for an increase in the Appellant's PCS authorization from 84 hours per week to 24-Hour split shift personal care services. On October 6, 2023 the Appellant, or the Appellant's Representative, requested an internal Plan appeal of the Coverage Determination Notice dated September 18, 2023. By Final Adverse Determination Notice dated October 8, 2023, the Plan determined to uphold its determination to deny the request for an increase in the Appellant's PCS authorization from 84 hours per week to 24-Hour split shift personal care services. At the hearing, the Appellant gave verbal authorization to have her son speak on her behalf and act as her representative at the hearing. The Appellant's son testified the Appellant is requesting additional hours for several reasons. First, the Appellant is wheelchair bound and unable to stand for more than a few minutes at a time. Second, the Appellant has difficulty getting into and out of her bed. Third, the Appellant suffers from poor circulation which makes it difficult to stand or walk. Finally, the Appellant's son testified the Appellant is now suffering from increased episodes of incontinence. When questioned, the Appellant's son stated the increased incontinence issues occurred after the last assessment done by the Plan.

Further, General Information System message GIS 03 MA/03 states that agencies should authorize assistance with recognized, medically necessary personal care services tasks. Agencies are not required to allot time for safety monitoring as a separate task as part of the total personal care services hours authorized.

Here, the Plan has established that the Appellant's need for assistance when performing ADLs and IADLs was properly assessed by a Plan nurse evaluator using a UAS-NY report. The Appellant described needing assistance with walking and bed mobility. A review of the Plan's records demonstrates that the nurse evaluator determined the Appellant requires extensive assistance when performing each of these tasks and accordingly, allotted 200 minutes per week for walking and 140 minutes per week for bed mobility. The Appellant provided no records or testimony to indicate that the time allotted by the Plan to complete these tasks is insufficient. Moreover, the Plan authorized the Appellant to receive 84 hours per week of PCS services, which is above the 35.8 hours per week recommended per the tasking tool. Thus, the Plan's records demonstrate that additional time is available to the Appellant for completion of ADLs and IADLs than the amount of time for which she was assessed to need.

Based on the foregoing, the Plan's determination to deny the request for an increase in the Appellant's personal care services (PCS) authorization from 84 hours per week to 24-Hour split shift personal care services was correct and is affirmed.